UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ISIDORO RIVERA, JOSE ALVARADO,
JUAN BUSTILLO, NOBERTO ALVAREZ,
ELSA MEJIA VILLALOBO, BRIAN
FREDERICKS, ELI CHAVEZ, MARTA
VILLATORO, ANA MARIA MORA GOMEZ,

                     Plaintiffs,                   **MEMORANDUM & ORDER**
    -against-                        06 CV 2613  (DRH) (ARL)

THE INCORPORATED VILLAGE OF
FARMINGDALE, SECATOGUE REALTY, LLC,
JOHN TOSINI, and MICHELLE TOSINI,

                     Defendants.
----------------------------------------------------------X
**APPEARANCES:**

**COMMUNITY LEGAL ASSISTANCE CORP.**
Attorneys for Plaintiffs
108 Hofstra University
Hempstead, New York 11549
By:    Stefan Hillel Krieger, Esq.
        Lynn Capuano, Esq.

**NIXON PEABODY LLP**
Attorneys for Plaintiffs
50 Jericho Quad
Suite 300
Jericho, New York 11753
By:    Mark L. Deckman, Esq.

**WALSH MARKUS MCDOUGAL & DEBELLIS, LLP**
Attorneys for Defendant the Incorporated Village of Farmingdale
229 Seventh Street
Garden City, New York 11530
By:    Stephen Paul Markus, Esq.
        Claudio DeBellis, Esq.

**HURLEY, Senior District Judge:**

     Plaintiffs Isidoro Rivera, Jose Alvarado, Juan Bustillo, Noberto Alvarez, Elsa Mejia

Villalobo, Brian Fredericks, Eli Chavez, Marta Villatoro, and Ana Maria Mora Gomez (collectively, "Plaintiffs") bring this action alleging that defendant the Incorporated Village of Farmingdale (the "Village") engaged in discriminatory housing practices in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. (the "FHA").  Presently before the Court is the Village's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]  For the reasons that follow, the Village's motion is denied.

## BACKGROUND

The material facts, drawn from the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted.

### The Parties

Plaintiffs are all Hispanic individuals who are former residents of a 54-unit apartment building at 150 Secatogue Avenue (the "Building"), which is located in the Village.  The Village is a municipal corporation incorporated pursuant to New York Village Law, and is located within Nassau County, New York.  Secatogue Realty, LLC ("Secatogue") is a New York limited liability company with its principal place of business in New York.  Secatogue owned the Building from 1999 until July 2006.  John Tosini is a member of Secatogue, and Michelle Tosini is an agent for Secatogue.

### The Building and Surrounding Area

The Building is located in an area of the Village bounded by Secatogue Avenue to the

---

[1]	Defendants Secatogue Realty, LLC, John Tosini, and Michelle Tosini have separately moved for summary judgment seeking the dismissal of Plaintiffs' claims asserted against them for violations of the FHA, New York Executive Law § 296(6), and New York Real Property Law § 235-b.  That motion is addressed in a separate Memorandum & Order.

east, South Front Street to the north, Elizabeth Street to the west, and Conklin Street to the south.

Another multi-family dwelling residence with twelve rental units was located at 130 Secatogue

Avenue, which was on the same block as the Building. The average monthly rent paid by tenants

in the Building was $1,111, which was "just within the limits of affordability for 'very low

income' households." (Pls.' 56.1 ¶ 33.) The area surrounding the Building was the Village's

only predominately Hispanic neighborhood. Within the Building, nearly half of the residents

were Hispanic.

***Alleged Anti-Hispanic Day Laborer Sentiment in the Village Between 2002 and 2004***

Plaintiffs contend that throughout the years between 2002 and 2004, Village residents

expressed, via internet postings and comments at meetings of the Village Board of Trustees,

hostility towards Hispanic day laborers seeking work within the Village. Plaintiffs further assert

that, in an attempt to decrease the amount of day laborer activity, the Village placed "no stopping

or standing" signs in areas when day laborers were known to congregate. The Village asserts that

these restrictions were "enacted for the health and safety of pedestrians and day laborers."

(Def.'s 56.1 ¶ 3.)

***The SARP***

Between 1999 and 2004, the Village assessed the potential for developing the area around

the Building, and referred to the potential project as the "Secatogue Avenue Redevelopment

Project" or "SARP." In 1999, the Village considered acquiring the Building and 130 Secatogue

Avenue via eminent domain with the intention of subsequently having both buildings privately

redeveloped. In 2002, the Village hired H2M Group, an engineering firm that specializes in

environmental studies, to complete an Environmental Impact Statement ("EIS"). According to

this EIS, the SARP involved the projected redevelopment of approximately 250,000 square feet of land surrounding the Building and 130 Secatogue Avenue. The plan included removing the existing buildings from the area and creating five new buildings with a combined 237 residential housing units. (Pls.' 56.1 ¶ 65.)

### The 2004 Village Election

Between January and March 2004, the Farmingdale Family Party distributed campaign literature urging voters not to re-elect Mayor Joseph Trudden, who had served as the Village's mayor since 1992. The campaign was successful and in March 2004, the Farmingdale Family Party's mayoral candidate, George Graf, as well as his party's candidates for Village Board of Trustees, were elected.

### Renewed Efforts to Redevelop the Area Around the Building

Plaintiffs assert that after Graf's election, he and his administration stepped up enforcement of the existing parking and "no standing" regulations allegedly aimed at Hispanic day laborers. Plaintiffs further contend that the Graf Administration revived the SARP and took further steps to revitalize the area surrounding the Building, including publicly emphasizing the Village's intentions to redevelop the area and requesting updates to the EIS performed under the prior administration. The Village insists, however, that it never enacted any Secatogue Avenue Redevelopment Plan. (Def.'s 56.1 ¶ 1.)

### Sale of the Building

On December 16, 2004, Fairfield Acquisition, LLC ("Fairfield") signed an agreement of sale with Secatogue for the purchase of the Building.

***Building Permit Applications***

In July 2005, Fairfield submitted to the Village building permit applications as a first step toward renovating the Building. As discussed more fully below, Plaintiffs contend that the Village failed to follow its own code and procedure in evaluating and ultimately approving Fairfield's building permit applications. The Village Board of Trustees approved Fairfield's building permit application on August 16, 2005 and the Village issued Fairfield a building permit on July 27, 2006.

***Impact of the Renovation on the Building's Tenants***

In December 2004, Secatogue and Fairfield agreed that, after due diligence was completed and Fairfield waived its right to cancel the purchase of the Building, lease extensions for current tenants of the Building would be limited to thirty days. One year later, Secatogue and Fairfield agreed that Secatogue would buy out or relocate any tenants whose leases expired after either the latter of June 30, 2006 or thirty days past the closing of the sale of the Building to Fairfield. Plaintiffs assert that after several of them refused to vacate their apartments, they were served with holdover petitions in May and June 2006. (Pls.' 56.1 ¶¶ 298-302.) By the time Fairfield closed on the sale of the Building in July 2006, only nine tenants remained in the Building. Eventually, all of the Building's residents, including all of the Plaintiffs, were forced to vacate the premises. (*Id.* ¶¶ 303-04.)

## RELEVANT PROCEDURAL BACKGROUND

Fairfield was initially named as a defendant in this action, which was commenced on May 25, 2006. On September 21, 2006, Plaintiffs filed an order to show cause seeking a temporary restraining order and preliminary injunction prohibiting Fairfield from terminating certain

plaintiffs' leases on September 30 and October 31, 2006 and seeking their eviction from the Building. Subsequently, however Fairfield reached a settlement agreement with Plaintiffs by which Fairfield agreed to pay nine plaintiffs certain monetary amounts in exchange for Fairfield's dismissal from the suit.

On January 17, 2007, Plaintiffs filed an amended complaint reflecting the withdrawal of plaintiffs Lorena Umana and Oscar Ramirez and the addition of three new plaintiffs, Ana Maria Mora Gomez, Orlando Pintor Jimenez, and Marta Villatoro.[2] The Amended Complaint also named John and Michelle Tosini as defendants. (*See* Mag. Judge Lindsay's June 16, 2008 R &R at 4.)

## DISCUSSION

### I.    Standing

Despite Plaintiffs' characterization of this case as one in which "the Village's creation and implementation of a redevelopment plan [ ] made housing unavailable to Hispanics" (*see* Pls.' Opp'n at 1), the Village asserts that it "never enacted any Secatogue Avenue Redevelopment Plan," nor did it "enact[ ] any Redevelopment Plan which resulted in the termination of Plaintiffs' leases with Secatogue Realty" (*see* Def.'s 56.1 ¶¶ 1, 2). Plaintiffs argue that "[t]he Village did enact the Secatogue Avenue Redevelopment Plan, which was effectuated through private development" – namely, Fairfield's renovation of the Building. (*See* Pls.' Response to Def.'s 56.1 ¶ 2.) Although not specifically framed as such, the Village's argument implies a challenge to Plaintiffs' standing. Therefore, the Court must, as an initial matter, examine the record evidence for any genuine disputed issues of fact as to the role the Village played in the displacement of Plaintiffs from the Building.

---

[2]    The parties' subsequent stipulation dismissing Plaintiff Orlando Pintor Jimenez's claims against all defendants was "So Ordered" on August 10, 2009.

*See Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 116 n.31 (1979) ("Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.").[3]

"Standing under the FHA . . . is coextensive with Article III standing. . . . Therefore, to bring suit, a plaintiff must meet only 'the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury.'" *Fair Hous. in Huntington Comm. v. Town of Huntington*, 312 F.3d 357, 362 (2d Cir. 2003) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 383 (1982)). The Village contends that "a municipal government cannot enact a redevelopment plan without a vote of the legislative body and no such vote occurred here." (Reply Mem. at 7.) The Village further asserts that its sole role in the redevelopment of the Building was issuing Fairfield a building permit – a "ministerial act" that Plaintiffs have not shown was "based upon the ethnic makeup" of the Building's residents. (Vill.'s Mem. at 9.)

After examining the voluminous record, however, the Court finds that genuine issues of fact do exist as to the role the Village played in Fairfield's renovation of the Building, whether via a formal redevelopment plan such as the SARP or a more informal course of action taken to achieve the Village's desired redevelopment result. As early as 1999, the Village considered the idea of redeveloping the area around the Building by acquiring the property via eminent domain. (Giordano

---

[3]     The Village did challenge Plaintiffs' standing to bring an FHA claim as part of its Rule 12(b)(6) motion to dismiss. In her June 16, 2008 Report and Recommendation that the motion be denied, Magistrate Judge Lindsay noted that "[w]hile the Village may ultimately prove that it 'had nothing to do with the actions of [the] private developer to renovate a poorly maintained building,' this standing challenge, which relies on the factual underpinnings of the suit, must be rejected at this stage in the proceedings." (June 16, 2008 R & R at 5-6 (internal citation omitted).)

Dep. at 96-102.)  In 2003, the Village commissioned H2M to draft an EIS for "The Secatogue

Avenue Redevelopment Plan," a "proposed" "redevelopment plan for a blighted area . . . [of] an

approximate 250,000 square foot area of land surrounding 130-150 Secatogue Avenue."  (Pls.' Ex.

4.)  Five months after Mayor Graf was elected, he published a "From Your Mayor" opinion piece

in the Farmingdale Observer, which stated, in part: "We have defined an area of the Village for

possible redevelopment and have . . . put this plan on the 'front burner.'  Much of the property [near]

Secatogue Avenue . . . is within the 'blighted' area."  (Ex. 180.)

The Court notes that the record does not support Plaintiffs' assertions that "the Village did

solicit Fairfield to purchase the building"[4] and "the Village played the role of developer"[5] of

_____

[4]        *See, e.g.,* Aff. of Mark Broxmeyer, dated Sept. 25, 2006 (stating that Fairfield
learned about the Building through its real estate broker, who is unrelated to the Village, and that
the Village did not request that Fairfield be shown the Building and did not provide any
assistance or incentives to purchase the Building).  In addition, in its opposition papers to the
motion for summary judgment made by Secatogue, John Tosini and Michelle Tosini, Plaintiffs
admitted that the Village "played no role in the introduction of" Fairfield to Secatogue "with
regard to the sale of" the Building.  (*See* Pls.' Response to Secatogue Defendants' 56.1 ¶ 13.)

[5]        Because Plaintiffs rely heavily on the following excerpt from the deposition
testimony of Village Attorney Greg Carman, the Court feels compelled to note the lack of weight
it affords to that testimony.  Plaintiffs assert that "[w]hen Fairfield purchased [the Building] in
2004, the Village embraced Fairfield for the implementation of the SARP, and *in the words of
the Village Attorney, played the role of 'the developer' for the project*."  (Pls.' Response to Def.'s
56.1 ¶ 1 (emphasis added); *see also id.* ¶ 10.)  The original transcript from Carman's May 13,
2009 deposition reflects that, after he was asked to describe the Village's role in the sale of the
Building from Secatogue to Fairfield, Carman answered: "The Village's role would be to either
approve or deny an application to improve the property."  (May 13, 2009 Carman Dep. at 201-
02.)  By letter dated March 26, 2010, the stenographer who transcribed Carman's deposition
provided Plaintiffs' counsel with a corrected transcript, which inserted a previously-omitted
"false start" to Carman's above-quoted answer.  Thus, the revised transcript of Carman's answer
to the same question reads: "The developer – the Village's role would be to either approve or
deny an application to improve the property."  (*See* May 13, 2009 "Corrected" Carman Dep. at
201-02.)  Because Plaintiffs rely solely on this "false start" in Carman's testimony – taken
entirely out of context from the remainder of his answer – for its assertion that the Village played
the role of "developer" in the Building's redevelopment project, the Court declines to find this

Fairfield's renovation of the Building. There is, however, evidence in the record that, following the sale of the Building from Secatogue to Fairfield, the Village played an active role in the communications that were exchanged between the parties in anticipation of Fairfield's submission of its building permit application to the Village. For example, there is evidence that Village Attorney Greg Carman had conversations with both Tosini, as a member of Secatogue, and Fairfield representatives after those entities had entered into the contract for sale of the Building but before the property actually changed hands. During those conversations, Carman was requested to provide, and did provide, some level of "assurances" to both sides "that they would be able to address their contractual obligations to one another and . . . would be able to address whatever they needed with the Village, so that the Village wouldn't be an obstacle to the transaction." (May 13, 2009 Carman Dep. at 277-78.) There is additional evidence of telephone conversations and meetings between one or both parties to the contract for sale of the Building and the Village regarding the sale and Fairfield's plans to renovate the Building. (*See e.g.,* Hynes Dep. at 82-85.)

Moreover, despite the Village's insistence that it never enacted any formal SARP or other redevelopment plan, there is evidence that when Mayor Graf was elected in late 2004 he still had an interest in developing the area surveyed in H2M's EIS for SARP. Even though Fairfield only wanted to renovate the Building – a portion of the "250,000 square foot area of land surrounding 130-150 Secatogue Avenue" (Pls.' Ex. 4) – Mayor Graf considered Fairfield's renovation of the Building to be "phase one" in the redevelopment of the entire area. (Giordano Dep. at 342-43.) Additionally, in September 2006, Mayor Graf published a "Message" in the Farmingdale Village Report informing his constituents that "[t]he fruits of our efforts these last two plus years are numerous," and listed

assertion supported by the record evidence.

the renovation of the Building as one of the "administration projects and other projects of significance within the Village boundary."  (Pls.' Ex. 187.)

Taken as a whole, the Court finds that even if the Village's "legislative body" never voted to formally enact the SARP (*see* Reply Mem. at 7), there exist questions of fact regarding whether the renovation of the Building was taken pursuant to an informal Village redevelopment plan. Therefore it "remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Gladstone Realtors*, 441 U.S. at 116 n.31.

## II.    *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that

there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

### III.    The Village's Motion for Summary Judgment is Denied

The Fair Housing Act of 1968, as amended by the Fair Housing Act Amendments Act of 1988 "prohibits governmental agencies from implementing or enforcing housing policies in a

discriminatory manner." *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003); *see also* 42 U.S.C. § 3604. The FHA "protects against discrimination on the basis of 'race, color, religion, sex, familial status, or national origin.'" *Valdez v. Town of Brookhaven*, 2005 WL 3454708, at *12 (E.D.N.Y. Dec. 15, 2005) (quoting 42 U.S.C. § 3604). "An FHA violation may be established on a theory of disparate impact or one of disparate treatment." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995). Plaintiffs have asserted claims under both theories.

### A.    *Plaintiffs' Disparate Impact Claim*

### 1.    <u>Legal Standard for Prima Facie Case of Disparate Impact</u>

"A disparate impact analysis examines a facially-neutral policy or practice . . . for its differential impact or effect on a particular group." *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir. 1988). Claims of disparate impact under the FHA are analyzed "under a modified version of the burden-shifting analysis usually applied to employment discrimination cases under Title VII of the Civil Rights Act of 1964." *Quad Enters. Co., LLC v. Town of Southold*, 369 Fed. Appx. 202, 205-06 (2d Cir. Mar. 10, 2010); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order to set forth a *prima facie* case of disparate impact, Plaintiffs must show: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Tsombanidis*, 352 F.3d at 574-75 (internal quotation marks and emphasis omitted). Plaintiffs "need not show the [Village's] action was based on any discriminatory intent," but Plaintiffs must "prove that the [challenged] practice 'actually or predicably results in . . . discrimination.'" *Id.* at 575 (quoting *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 90 (2d Cir. 2000)). Plaintiffs must also "show a causal connection between the

facially neutral policy and the alleged discriminatory effect." *Id.*

"The basis for a successful disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy." *Id.* "This comparison must reveal that although neutral, the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals." *Id.* "Often, disproportionate impact is demonstrated through the use of statistics." *Valdez*, 2005 WL 3453708 at *13; *see also Tsombanidis*, 352 F.3d at 576 ("Statistical evidence is also normally used in cases involving fair housing disparate impact claims.")

### 2.   Appropriate Comparison Groups

The Village asserts that "the appropriate comparison groups are the Latino residents and the non-Latino residents" of the Building. (Vill. Mem. at 13.) The Village contends that "the impact [of] the redevelopment of [the Building] fell nearly equally upon the two comparison groups . . . since 100 percent of the Hispanics and 100 percent of the non-Hispanics were relocated from [the Building], there was no greater harm suffered by the Hispanics and there can be no disproportionate impact as a matter of law." (*Id.* at 14.)

In opposition, the Plaintiffs assert that "the SARP displaced Hispanics and deprived them of affordable housing at a greater rate than non-Hispanic whites." (Pls.' Opp'n at 5.) Plaintiffs dispute the Village's assertion that the proper comparison is between Hispanics and non-Hispanic whites [residing] at the Building." (*Id.* at 19.) Rather, Plaintiffs contend that "[t]he proper comparison is between Hispanics and whites affected [by the SARP] Village-wide." (*Id.*)

In "utiliz[ing] the appropriate comparison groups," Plaintiffs "must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated

persons who are unaffected by the policy." *Tsombanidis*, 352 F.3d at 576-77. Here, the "neutral policy" identified by Plaintiffs is not simply the renovation of the Building. Rather, Plaintiffs assert that the SARP as a whole is the "neutral policy" at issue – Plaintiffs contend that the renovation of the Building is simply "phase one" in the Village's larger plan to redevelop the entire surrounding area. (*See* Giordano Dep. at 342-43.) Therefore the Court agrees with Plaintiffs that the "appropriate comparison" is between Hispanic Farmingdale citizens who are impacted by the alleged SARP (whose "phase one" is the renovation of the Building) and non-Hispanic Farmingdale citizens who are impacted by the alleged SARP. *See Tsombanidis*, 352 F.3d at 576-77.

### 3. Disproportionate Impact

Plaintiffs assert that "[t]he uncontested report" of its expert witness demonstrates that "the SARP had a disproportionate impact on the Hispanic population." (Pls.' Opp'n at 19.) Plaintiffs retained Andrew A. Beveridge, Ph.D. ("Beveridge") as an "expert in demographic and statistical analysis" to "analyze the impact of the [SARP], most especially in regard to the rental complex at 150 Secatogue Avenue on the availability of affordable rental apartments inhabited by Hispanics." (Pls.' Ex. 63 at 3.) Beveridge's June 12, 2009 report (the "Expert Report") contains the following findings: (1) According to the 2000 census, Farmingdale's total population was 8,399, of which 12.6% were Hispanic and 80.8% were non-Hispanic white;[6] (2) Farmingdale's Hispanic population is "most concentrated in blocks in and around Secatogue Avenue near Eastern Parkway" while much

---

[6] Beveridge noted that the 2007 American Community Survey found that the Hispanic population of Nassau and Suffolk counties had increased from 10.3% to 12.9% and "[t]hus one can expect that Farmingdale Village's Hispanic population also has increased since Census 2000." (Pls.' Ex. 63 at 5.)

of the rest of Farmingdale has "little or no concentration of Hispanics"; (3) the SARP area[7] encompasses one small portion of the Village, which contained 411 of Farmingdale's 8,339 residents (or 4.8% of the Village population); and (4) in 2000, 21.9% of the Village's Hispanic population lived in the SARP area, while only 1.2% of the Village's non-Hispanic white residents lived in the SARP area. (*Id.* at 5-6.) Based on this information, Beveridge concluded that "21.9 percent of the [Village's] Hispanic[ ] [residents], but only 1.2 percent of the Village's non-Hispanic white residents, would be affected" by the SARP. (*Id.* at 6.)

After reviewing this statistical evidence as well as Beveridge's expert analysis and opinion, the Court finds that Plaintiffs have raised a genuine issue of fact whether the SARP – to the extent the jury finds the Village informally implemented it or any similar redevelopment plan – had a disproportionate impact on Farmingdale's Hispanic population. *See Valdez*, 2005 WL 3454708 at *14 (finding plaintiffs established prima facie case with evidence that the "Town has undertaken an outwardly neutral policy of stepped up quality of life enforcement that has resulted in a disproportionate adverse impact on Latinos").

### 4. Disproportionate Deprivation of Affordable Housing

Plaintiffs further contend that the SARP's disproportionate impact on Farmingdale's Hispanic population is evidenced by the following: "Because Hispanics in the Village overall have a greater need for affordable housing than non-Hispanic whites in the Village, implementation of the

---

[7] Beveridge defined the SARP area as "bounded by Secatogue Avenue to the East, the Northern Boundary of Commercial Lots on Conklin Street to the South, Elizabeth Street to the West, and South Front Street to the North." (Pls.' Ex. 63 at 6.) The 2003 EIS for "The Secatogue Avenue Redevelopment Plan," described the area to be redeveloped as "a blighted area . . . [of] an approximate 250,000 square foot area of land surrounding 130-150 Secatogue Avenue." (Pls.' Ex. 4.)

SARP and redevelopment of the Building deprived [Hispanics] of affordable housing with a disproportionate impact." (Pls.' Opp'n at 21.) The Village correctly notes that "[t]he FHA does not impose liability upon the municipality [for] failing to provide a particular type of housing for a particular group of individuals." (Vill. Mem. at 18 (citing *Acevedo v. Nassau Cnty.*, 500 F.2d 1078, 1082 (2d Cir. 1974)) ("The Fair Housing Act does not impose any duty upon a governmental body to construct or to plan for, approve and promote any housing.").) Plaintiffs respond, however, that they "do not claim that the Village failed to provide affordable housing but rather that the Village destroyed existing affordable housing, a cognizable basis for a disparate impact claim." (Pls.' Opp'n at 21.) Indeed, Plaintiffs assert, and the Village does not dispute, that "[n]one of the Plaintiffs have been able to afford the rents at the Building after its redevelopment." (Pls.' 56.1 ¶ 267.)[8]

Beveridge provided the following analysis and expert opinion in support of Plaintiffs' claim: (1) "Affordable housing opportunities in Farmingdale . . . are quite scarce," and residents' "affordability [ ] problems" especially affect Hispanic residents, a larger proportion of whom are classified as low income according to Census and HUD measures;" (2) Among Farmingdale renters, "36.4 percent of all households experienced housing problems in contrast to 62.4 percent for households with Hispanic householder;"[9] (3) "Thus, even before the destruction of affordable housing opportunities in 150 Secatogue Avenue, Hispanic renter households were especially affected by housing problems, most especially housing affordability;" and (4) "[I]n Farmingdale, 44.3 percent

---

[8]      Plaintiff Ana Maria Mora Gomez did return to and live in the Building from November 2006 through December 2009 and paid a reduced rent pursuant to an agreement with Fairfield. (Pls.' 56.1 ¶ 268.) Plaintiff Gomez left the Building in December 2009 when the agreement expired because she could no longer afford the rent. (*Id.*)

[9]      Beveridge opined that "[t]he most prevalent 'housing problem' for renters in Farmingdale and Nassau and Suffolk Counties is housing affordability." (Pls.' Ex. 63 at 9.)

of all renters are low-income, but among Hispanics the figure is 56.4 percent." (Pls.' Ex. 63 at 9-11.) Based on this statistical analysis, Beveridge concluded that "[t]he renovation of 150 Secatogue Avenue reduced the number of affordable housing opportunities in Farmingdale . . . [which] had a disparate impact on Hispanics in Farmingdale." (*Id.* at 11.)

Accordingly, Plaintiffs have submitted evidence: (1) that Hispanics in Farmingdale have a "proportionately greater need" for affordable housing than non-Hispanic whites, and (2) that a causal connection existed between the elimination of affordable rental opportunities in the Building – allegedly as "phase one" of the SARP – and a disproportionate impact on Farmingdale Hispanic residents' access to affordable housing. *See Quad Enters Co., LLC*, 369 Fed. Appx. at 206 (finding that in order to establish a prima facie case of disparate impact, plaintiffs "needed to show" that "handicapped seniors have a proportionally greater need . . . for this type of multifamily age-restricted unit than do non-handicapped seniors" and "allow for a causal analysis between the claim of discrimination based on the handicap and the facially neutral policy") (internal quotation marks and alterations omitted); *Town of Huntington*, 844 F.2d at 938 (finding disparate impact of failure to rezone to allow construction of new subsidized housing projects when disproportionately higher percentage of black families needed subsidized housing, held Section 8 certificates, and were on waiting lists for such certificates).

For the reasons set forth above, the Court finds that a reasonable juror could conclude that Plaintiffs have established a *prima facie* case of disparate impact under the FHA. The Court must therefore consider the Village's asserted justifications for its actions. *See Town of Huntington*, 844 F.2d at 938.

### 5.    The Village's Asserted Legitimate Justification

"Once a plaintiff has made a prima facie showing of discriminatory effect, a defendant must present bona fide and legitimate justifications for its action with no less discriminatory alternatives available." *Town of Huntington*, 844 F.2d at 939 (citing *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 146-48 (3d Cir. 1977)).  There are two components to an analysis of the defendant's proffered justification: (1) "whether the reasons are bona fide and legitimate; and (2) whether any less discriminatory alternative can serve those ends." *Id.*  Plaintiffs are not required to prove that the Village's stated justifications were pretextual. *Id.*

The Village claims it "had and continues to have a legitimate bona fide interest governmental interest in . . . having the owner renovate 150 Secatogue" as part of an effort to "renovate and improve blighted areas which, left alone, would decrease property values and undermine the general welfare of the community's residents" as well as to "preserve [the Village's] small town character, its open spaces and its low population density." (Vill. Mem. at 18-19.)  Plaintiffs argue that the Village's "stated reasons are no more than 'post hoc rationalizations'" and that "the state of the Building and the area was in large part a consequence of the Village's own actions," including failing to enforce Village housing codes and allowing the Building to fall into a state of disrepair. (Pls.' Opp'n at 23-24.)

The Village has not cited to any portion of the record, which encompasses literally thousands of pages of documents, deposition testimony, and transcripts, in support of its asserted justification – and the Court declines to undertake that burden in the first instance. And, as noted above, there are several issues of fact with respect to Plaintiffs' prima facie case for a jury to decide.  Accordingly, the Village's motion for summary judgment dismissing Plaintiffs' disparate impact claim under the

FHA is denied.

### B.      *Plaintiffs' Disparate Treatment Claim*

#### 1.      <u>Parties' Contentions</u>

The Village asserts that Plaintiffs' disparate treatment claim is "nothing more than a disguised claim of 'wealth discrimination,'" in that the crux of their claim "is, at best, that a certain type of housing at a favorable pricing was not made available to them." (Vill.'s Mem. at 4 (collecting cases standing for the proposition that "there is no constitutional right to particular housing at a desired price"). Further, the Village argues that Plaintiffs have adduced "no evidence of a discriminatory animus sufficient to establish a disparate treatment claim." (*Id.* at 5.) At most, according to the Village, Plaintiffs have offered evidence of "irrelevant interactions between the Village and day laborers," which does nothing to demonstrate "the Village's attitude toward Latino residents at 150 Secatogue." (*Id.* at 6.) Finally, the Village contends that Plaintiffs' reliance on "the Village's alleged violation of its own code . . . as support for the claim that the Village acted with discriminatory animus . . . is not supported by the evidence." (*Id.* at 7.)

In opposition, Plaintiffs assert that they "do not demand that the Village provide them housing at a certain price." (Pls.' Opp'n at 4.) Rather, Plaintiffs claim that "the Village intentionally targeted the only Hispanic neighborhood in the Village by eliminating the existing affordable housing inhabited predominately by Hispanic tenants." (*Id.*) According to Plaintiffs, "[a]s a result of the SARP, all the tenants in the Building, including Plaintiffs[,] were displaced." (*Id.* at 3.) Plaintiffs further contend that the following facts demonstrate that their national origin "was a motivating factor" for the Village's actions: (1) "the SARP displaced Hispanics and deprived them of affordable housing at a greater rate than non-Hispanic whites, and perpetuated segregation within

the Village," (2) "the Village created and implemented the SARP within a climate of extreme public anti-Hispanic sentiment voiced in response to the increasing Hispanic population in the Village," (3) the "sequence of events leading to the development of the SARP reveals that the Village responded to anti-Hispanic sentiment" in the community, and (4) the "Village failed to adhere to normal procedural sequences and normal substantive criteria in approving and issuing the building permit" to Fairfield. (*Id.* at 3-12.)

## 2. Legal Standard for Prima Facie Case of Disparate Treatment

Claims of disparate treatment under the FHA are analyzed "under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*" *Reg'l Econ. Cmty Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002). A plaintiff may "establish a *prima facie* case by showing that animus against the protected group 'was a significant factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg*, 67 F.3d at 425 (quoting *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir. 1987) ("*Yonkers*")). "If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons." *Id.*

"Discriminatory intent may be inferred from the totality of the circumstances." *Id.* Relevant factors include: "[t]he impact of the official action whether it 'bears more heavily on one race than another,'" "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly

favor a decision contrary to the one reached," and "contemporary statements by members of the decisionmaking body, or reports." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). Plaintiffs contend that "[c]onsideration of the factors listed under *Arlington Heights* . . . establish that there is a genuine issue of fact as to whether the Village had the requisite discriminatory intent to establish a disparate treatment claim under the FHA." (Pls.' Opp'n at 4.)

        a.     *Impact of the Challenged Action*

For the reasons discussion in Section III.A, *supra*, the Court finds that a reasonable juror could conclude that the alleged SARP disproportionately impacted Farmingdale's Hispanic population.

        b.     *Historical Background and Prior Sequence of Events*

Plaintiffs contend that "the Village created and implemented the SARP within a climate of extreme public anti-Hispanic sentiment voiced in response to the increasing Hispanic population in the Village." (Pls.' Opp'n at 5.) Plaintiffs have submitted evidence that between 2002 and 2004, Village residents made the following comments on the Internet: (1) "The economy of the village is heading down hill because of these day laborers. Just look at the quality of stores that are opening in the Village. Bodegas, Laundromats, Thrift Stores."[10] (Pls.' Ex. 194); (2) "[O]bviously the kids born here are not taking [ESL] classes [in Farmingdale public schools] to learn English, so it must be the offspring of the day laborers[,] many of whom do not encourage their kids to learn the language, because they do not speak it." (Pls.' Ex. 210); (3) "Everyone knows that white people from this country don[']t cause crimes . . . It[']s immigrants and the so called minorities . . . Before

_____

    [10]    A "bodega" is defined as a "small grocery store in an urban area; *specif*: one specializing in Hispanic groceries." *See Merriam-Webster's Collegiate Dictionary* 138 (11th ed. 2005).

you know it our town is going to be as dark as Amityville or the city and then where will you go." (Pls.' Ex. 211); (4) "And, to add to the frustration and danger involved with this situation, I've been told that there are now [h]ispanic gang members that hang around these day laborer sites, to shake down the day laborers when they return." (Pls.' Ex. 212.) The Court believes that a rational juror could conclude that these comments by members of the Farmingdale community, while discussing the anticipated or perceived negative effects that a day laborer population has and will continue to have on Farmingdale, also have anti-Hispanic undertones.

Plaintiffs have also submitted evidence of anti-Hispanic comments made by attendees of at least two meetings of the Village of Farmingdale Board of Trustees. Cristina Ruiz Diaz, a Hispanic person who "worked with and on behalf of Hispanic day laborers" during the relevant time period, submitted a declaration stating that she and her husband attended a Village Board of Trustees meeting in 2000 during which "[t]hose in attendance said that Hispanic day laborers are dirty, gathered on the streets, urinated on the streets, whistled at female pedestrians, and made rude comments . . . One person, who sat in the row in front of [Ruiz Diaz], turned . . . and said, 'you people should have your tubes tied.'" (Decl. of Cristina Ruiz Diaz ("Ruiz Diaz Decl.") at ¶ 4.) Ruiz Diaz recounts that at another Village Board of Trustees meeting, the President of the Concerned Citizens of Farmingdale "insisted that there was a connection between day laborers and gang activity," despite evidence to the contrary presented by a representative of the Nassau County Police Department. (*Id.* ¶ 7.) Carlos Canales submitted a declaration stating that he attended "numerous" Village Board of Trustee meetings in 2002 during which residents "said they did not want illegal aliens in their backyards, they were unhappy with [then-]Mayor Trudden, and unless he shut down the hiring site [set up by the Village for day laborers to congregate], they would vote for his

opponent." (Decl. of Carlos Canales ("Canales Decl.") ¶ 6.)[11]

In March 2004, a time period that Plaintiffs characterize as "in the midst of the controversy over Hispanic day laborers," the Village held elections for Mayor and Village Board of Trustees. (Pls.' 56.1 ¶ 67.) From January to early March 2004, Village residents received campaign materials from the Farmingdale Family Party's ("FFP") mayoral candidate, George Graf. (*Id.* ¶ 68.) The FFP distributed campaign materials that stated that incumbent Mayor Trudden's "soft approach to day laborers, and the opening of the hiring site is directly responsible for the day laborer crisis and increased gang activity in the Village." (Pls.' Ex. 171.) The FFP's materials supporting Thomas Langon, a candidate for Trustee in the Village, stated: "Because of the pressure that the Farmingdale Family Party candidates, along with fellow residents, have been putting on the current Village Board of Trustees not a single multi-family dwelling development project has been approved in the Village since November 2002. This is in direct contrast to the vast number of projects the current administration had approved before that period." (*Id.*) Other FFP campaign material linked the presence of day laborers in Farmingdale to the presence of "increased gang activity," and informed residents that "the gang MS-13 now has an active cell located in Farmingdale." (*Id.*)[12] According to the campaign literature, Graf and other FFP candidates "pledge[d] to do everything possible to get

---

[11]      In approximately April 2000, "advocates for Hispanic day laborers" met with then-Mayer Trudden, who agreed that day laborers could use a parking lot on Division Street as a hiring site. After the meeting, day laborers who attempted to use the Division Street parking lot were barred from entering it by police. (Pls.' 56.1 ¶ 55.) One week later, the Village offered a small piece of land on Elizabeth Street for use as a day laborer hiring site instead. (*Id.*) Eighteen months later, the Village closed the Elizabeth Street hiring site. (*Id.* ¶ 56.)

[12]      "MS-13" refers to the "violent street gang La Mar Salvatrucha," *U.S. v. Juvenile Male No. 2*, 2011 WL 223599, at *2 (E.D.N.Y. Jan. 26, 2011), which is considered to be a "Hispanic gang." *Daniel v. Walsh*, 2009 WL 3837304, at *3 (E.D.N.Y. Nov. 17, 2009).

these day laborers off our streets," including "work[ing] to enforce the codes of the Village to stop illegal apartments and overcrowding." (*Id.*) George Graf was elected Mayor of Farmingdale and was sworn into office in April 2004. (Pls.' 56.1 ¶ 72.)

After Mayor Graf took office, the Village undertook an effort to increase enforcement of parking regulations on Conklin Street, an area near the Building where day laborers were known to congregate, and extended the hours of enforcement for "no standing" regulations. (*Id.* ¶¶ 73, 74.) In September 2004, the Village hired two code enforcement officers to work with local police to issue notices of violation to individuals failing to comply with the Village's "no stopping laws," including those on "Conklin Street where trucks pick up Day Workers." (*Id.* ¶ 75 (quoting Pls.' Ex. 17).) The Village also installed 40 additional "no standing signs" in the area of the Building. (*Id.* ¶ 76) The Mayor and Village Clerk assured Village residents that the increase volume of violations and fines "primarily affected the out-of-town contractors and day laborers who were 'ruining out quality of life.'" (*Id.* ¶ 79 (quoting Pls.' Ex. 18).) These efforts resulted in a ninety percent decline in the day laborer count in the Village. (*Id.*)

The Village asserts that these increased traffic restrictions "were enacted for the health and safety of pedestrians and day laborers." (Def.'s 56.1 ¶ 3.) According to the Village, at least one fatality and eight pedestrian injuries that occurred on Conklin Street were attributable to trucks stopping to pick up day laborers. (*Id.* ¶ 4.) Plaintiffs dispute these contentions, describing them as lacking in "proper evidentiary foundation," and assert that "[t]he Village enacted the restrictions to force Hispanic day laborers out of the area on or around Conklin Street." (Pls.' Response to Def.'s 56.1 ¶¶ 3, 4.) Plaintiffs also provide evidence that Village residents had voiced concern over the need for parking regulations in other areas of the Village, specifically, the vicinity near the Howitt

24

School, an area approximately the same size as the area around the Building and Conklin Street. (Pls.' 56.1 ¶ 81.) According to Plaintiffs, despite this community request for increased traffic regulation enforcement in areas other than around the Building, the Village issued only 154 parking tickets in the Howitt School area in 2004 and 2005 – approximately 1,000 fewer tickets than were issued in the area of the Building during the same time period. (*Id.* ¶ 82.)

The Village asserts that "the allegations of [the Village's] animus toward Hispanics is belied by the record." (Reply Mem. at 10.) Specifically, the Village describes itself as "pro minority," and asserts that it "had a history of working with and assisting Hispanics." (*Id.* at 10 & n.3.) The Village proffers evidence that between approximately 1999 and 2003, the Village "hired a liaison who worked with Hispanics and assisted them in applying for and obtaining services and benefits," and "also worked with St. Killians Roman Catholic Church and its outreach program" as well as "Hispanic advocacy groups." (*Id.* at 10 n.3 (citing Giordano Dep. at 181-185).)

The Village argues that "Plaintiffs [have] come forward with nothing more than irrelevant interactions between the Village and day laborers," and while such evidence "perhaps [is] some indication of the Village's attitude toward day laborers and the safety issues relating thereto [it] is not the equivalent of [evidence of] the Village's attitude toward Latino residents of" the Building. (Vill. Mem. at 6.)

Plaintiffs, who are all Hispanic individuals, admit that they are not day laborers themselves. (Def.'s 56.1 ¶ 5.) There is undisputed evidence in the record, however, that the day laborers in the Village were largely – if not exclusively – Hispanic persons. (*See, e.g.*, Ruiz Diaz Decl. ¶ 1; Decl. of Janet Liotta, dated April 11, 2010 ¶ 1.). There is also record evidence, set forth above, that Village residents equated the day laborer population with the Hispanic population and that the

community's hostility towards the former group was also directed at the latter. *See Yonkers*, 837 F.2d at 1226 ("Given the district court's finding . . . that racial animus was a significant factor motivating those white residents . . . the City may properly be held liable for the segregative effects of a decision to cater to this 'will of the people.'").  There is also evidence in the record that the Farmingdale community sought to elect a mayor who would address their concerns about the Hispanic day laborer population and that the FFP's candidates emphasized the anti-day laborer component of their platforms. *See Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 549 (S.D.N.Y. 2006) (finding that comments made by public official about day laborers that were "negative and stigmatizing" constituted "some evidence of racism").  Plaintiffs have also proffered evidence that despite some community requests for increased traffic regulation enforcement in other areas of the Village, the large percentage of traffic violations were issued in the area of the Building. *See id.* at 546-57 (evidence that Village "aggressive[ly] ticketed" Hispanic day laborers but "did not strictly enforce, and sometimes ignored, traffic and parking infractions that occurred in other part of the Village" could lead to an inference of discrimination").  Finally, Plaintiffs have proffered evidence that the area around the Building housed the majority of the Hispanic population of Farmingdale. (Pls.' Ex. 63 at 6.)

With this evidence in mind, the Court concludes that a reasonable juror could find that the Village's conduct – although ostensibly aimed at the day laborers congregating near the Building – did, in fact, have an anti-Hispanic element. *See Reg'l Econ. Cmty. Action Program, Inc.*, 294 F.3d at 50-51 (finding plaintiffs established prima facie case when "City officials and Planning Board members made numerous statements from which a reasonable juror could infer that they denied [plaintiffs'] permit application because of the identity of its clients").

### c.   *Departures from Normal Procedure*

Plaintiffs assert that the Village made numerous deviations from procedure in an effort to ensure that Fairfield's permit application was approved and that the Building's renovation went according to plan. (Pls.' Opp'n at 12-18.) The Court finds that the record contains questions of fact as to whether the Village did, in fact, deviate from procedure and sets forth the following as examples.

### i.   The Temporary Moratorium

On June 5, 2006, a six-month moratorium went into effect that prohibited the issuance of building permits for any construction project that would create additional housing units. (Def.'s Ex. M.) Because Fairfield's permit application was approved on August 16, 2005 (*see* Pls.' Ex. 76), the Village argues that the moratorium would not applicable to the Building's renovation. Plaintiffs respond that the permit was not actually issued until July 27, 2006 and, therefore, the moratorium should have applied. (Pls.' Ex. 76.) During a June 5, 2006 Village Board of Trustees meeting, the Village Attorney stated that Fairfield's permit application would not be affected by the moratorium if the renovation did not create additional housing or parking units at the Building. (Pls.' Ex. 23.) Plaintiffs assert that plans and drawings of the Building submitted to Village between 2005 and 2007 show the planned expansion of 884 square feet (Pls.' Exs. 65, 231), although the Village contends that no additional apartments were ever constructed for the Building.

After reviewing the voluminous documentation and deposition transcripts submitted, the Court finds that genuine disputes of material fact exist whether Fairfield's permit was issued in violation of the moratorium. There is evidence in the record that at least one version of Fairfield's permit application listed the Building as a 56-unit, rather than the existing 54-unit complex. (Craig

Dep. at 253-54.)  Moreover, there is undisputed evidence that Fairfield's permit called for an 884 square foot expansion of the Building's floor plan.[13]  The Village asserts that this additional square footage was used to add bay windows to certain apartments, but does not cite to anything in the record to support that assertion.  (Reply Mem. at 8.)  Finally, Fairfield's architect testified that the question of the applicability of the moratorium to Fairfield's permit application was resolved in a "30 second" appearance before the Village Planning Board – the architect could not recall even speaking to the Planning Board before he was "dismissed."  (Pirkel Dep. at 189-91.)

ii.    The Summonses

Plaintiffs assert that the Village "ben[t] over backwards" to "remove any encumbrances to the sale of the [B]uilding."  (Pls.' Opp'n at 17.)  For example, Plaintiffs state that "[d]espite issuing Secatogue Realty 175 building code violations . . . [in approximately] October 2004, the Village disregarded its normal policy and summarily dismissed all the summonses on September 21, 2005 without an inspection or proof of compliance."  (Id.)  The Village contends, and Plaintiffs do not dispute, that "[t]he Village Court prosecuted the summonses issued to Secatogue Realty and it paid $22,000 in fines."  (Def.'s 56.1 ¶ 9.)  However, Plaintiffs dispute the Village's assertion that Secatogue "made approximately $169,000 in repairs to the [B]uilding," and contend that the "evidence produced in discovery only shows that Secatogue [ ] spent approximately $68,000 for repairs in 2004 and 2005."  (Pls.' Response to Def.'s 56.1 ¶ 9.)  Moreover, after inspecting the

_____

[13]    Plaintiffs assert that this enlargement violated Village Code § 105-8, which prohibits the enlargement of a legal non-conforming building without receiving a variance or changing to conforming use.  (See Pls.' Opp'n at 16.)  Plaintiffs contend that Fairfield never requested a variance and its permit application was approved without a public hearing.  (Id.)

Building in late 2005, Plaintiffs' expert[14] opined that even though the Village discharged the 175

violations, 36 of those violations "were never rectified" and certain of the repairs that were made

were "done in a 'substandard and shoddy' manner." (*Id.*; *see, e.g.*, Pls.' Ex. 66 at ex. B.) By

contrast, the Village contends that the necessary repairs were done, and that the Building was

brought into compliance with the Village Code. (Craig Dep. at 263.) Accordingly, disputed issues

of fact exist here.

iii.     <u>Alleged Violations of Village Code § 105-8</u>

Section 105-8 of the Code of the Village of Farmingdale ("Village Code") provides that:

> Any nonconforming use lawfully existing in any building or premises
> at the time of the adoption of this ordinance may be continued. Any
> existing building designed and arranged for or devoted to such
> nonconforming use may be reconstructed or structurally altered,
> subject to the following regulations:
>
> A. The structural alterations made in such building shall in no case
> exceed fifty percent (50%) of its value, nor shall the building be
> enlarged unless the use therein is changed to a conforming use.

(Pls.' Ex. 122 (setting forth Farmingdale Vill. Code § 105-8).) The Village Code provides that the

building's "value," as that term is used in Section 105-8, shall be determined as follows:

> The assessed value of a building as it appears upon the assessment
> roll of the County of Nassau shall, in the absence of evidence to the
> contrary, be deemed the true value of said building within the
> meaning of §§ 105-8 and 105-10 of this ordinance.

(*Id.* (Farmingdale Vill. Code § 105-11).)

Plaintiffs contend that the Building's assessed value in 2005 was $1,943,279 (Pls.' Ex. 70),

and Plaintiffs' expert states that "the cost of structural alterations as reflected in the set of drawings

---

[14]    Plaintiffs retained Robert A. Wolfson, P.E., a licensed professional engineer, to
"render an opinion in regard to the conditions at [the Building] in 2005." (Pls.' Ex. 66.)

submitted with Fairfield's building permit application was $3,057,226" (Pls.' Opp'n at 15; Pls.' Ex. 64).[15]  Thus, Plaintiffs assert that the structural alterations exceeded the assessed value of the Building by 157%.  (Pls.' Opp'n at 15.)  Plaintiffs contend that although "the application triggered the requirements of section 105-8(a), the Village did not require Fairfield to bring the Building up to code, did not hold a public hearing on the application, nor require Fairfield to request a variance." (*Id.*)[16]

By contrast, the Village asserts that "the final structural alterations were in the amount [of] $1,342,768."  (Vill. Mem. at 8; Def.'s Ex. L.)  The Village also contends that the Village Building Superintendent concluded that the Building's value was "nearly five million dollars" (Vill. Mem. at 8), which amount was based upon the Building's purchase price (Reply Mem. at 9.)  The Village contends that the Village Building Superintendent properly relied on the Building's "purchase price as evidence to the contrary of the true value of the [B]uilding," as is "explicitly permitted by Village Code § 105-11." (*Id.*)  Plaintiffs dispute this contention, arguing that "[t]he purchase price reflects the value of the building as well as the land."  (Pls.' Opp'n at 15 n.8.)

Overall, it is clear to the Court that disputed issues of fact exist regarding whether the Village violated Section 105-8 of the Village Code.

### iv.    Cost Evaluation of Fairfield's Permit Application

Plaintiffs assert that "[t]o expedite the redevelopment, the Village disregarded its normal

---

[15]    Plaintiffs retained Mark J. Mazz, AIA, a licensed architect, "to assess the accuracy of the cost estimate in the building permit applications for the renovations to [the Building]." (Pls.' Ex. 64.)

[16]    Neither party explains why the Building's use was a "nonconforming use" as that term in used in Section 105-8 of the Farmingdale Village Code.

practice in handling building permit applications . . . ." (Pls.' Opp'n at 13.)  Specifically, Plaintiffs

point to testimony by the Village Building Superintendent that his "standard practice when reviewing

a building permit application was to evaluate the estimated cost of construction and the plans

attached to the application for compliance with the Village's building and zoning codes." (*Id.* at 13;

*see also* Craig Dep. at 204.)  On July 21, 2005, Fairfield submitted its building permit application,

with attached site plans, identifying an estimated cost of construction of $2,000,000.  (Pls.' 56.1 ¶

148.)  This application was apparently rejected because of an improper signature, and was re-filed

one week later with the signature problem corrected.  (Craig Dep. at 193-95.)  The new version of

the application identified an estimated cost of construction of $750,000 and relied on the same site

plans that had been attached to the application filed one week earlier.  (*Id.*)  Although the Village

Building Superintendent accepted this cost estimate "at face value" (*id.* at 197), Plaintiffs' expert

"determined that the site plans represented a cost of construction of $4,030,502." (Pls.' Opp'n at 13;

Pls.' Ex. 64.)[17]   Plaintiffs assert that "the Village's willful blindness to Fairfield's obvious

misrepresentation in its permit application cleared the way for the Village to issue a permit on

August 16, 2005." (Pls.' Opp'n at 13-14.)  The Court finds there exist questions of fact regarding

this issue.

### 3.   Conclusion

The Court finds that questions of fact  preclude summary judgment dismissing Plaintiffs'

disparate treatment claim under the FHA.

---

[17]     The Village Building Superintendent testified that he did a cost evaluation when
he received Fairfield's permit application, but he could not recall the exact procedure he used.
(Craig Dep. at 204-05.)

## *CONCLUSION*

For the reasons set forth above, the Village's motion for summary judgment is DENIED.

**SO ORDERED.**

Dated: Central Islip, New York
       March 30, 2011

_____/s/_____
Denis R. Hurley
Unites States District Judge