UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ISIDORO RIVERA, JOSE ALVARADO,
JUAN BUSTILLO, NOBERTO ALVAREZ,
ELSA MEJIA VILLALOBO, BRIAN
FREDERICKS, ELI CHAVEZ, MARTA
VILLATORO, ANA MARIA MORA GOMEZ,

                        Plaintiffs,                        **MEMORANDUM & ORDER**

      -against-                             06 CV 2613  (DRH) (ARL)

THE INCORPORATED VILLAGE OF
FARMINGDALE, SECATOGUE REALTY, LLC,
JOHN TOSINI, and MICHELLE TOSINI,

                        Defendants.
-----------------------------------------------------------X
**APPEARANCES:**

**COMMUNITY LEGAL ASSISTANCE CORP.**
Attorneys for Plaintiffs
108 Hofstra University
Hempstead, New York 11549
By:    Stefan Hillel Krieger, Esq.
        Lynn Capuano, Esq.

**NIXON PEABODY LLP**
Attorneys for Plaintiffs
50 Jericho Quad
Suite 300
Jericho, New York 11753
By:    Mark L. Deckman, Esq.

**WALSH MARKUS MCDOUGAL & DEBELLIS, LLP**
Attorneys for Defendant the Incorporated Village of Farmingdale
229 Seventh Street
Garden City, New York 11530
By:    Stephen Paul Markus, Esq.
        Claudio DeBellis, Esq.

**KAPLAN BELSKY ROSS BARTELL, LLP**
Attorneys for Defendants Secatogue Realty LLC, John Tosini and Michelle Tosini
666 Old Country Road
Suite 602
Garden City, New York 11530
By:     Lewis A. Bartell, Esq.

**HURLEY, Senior District Judge:**

Plaintiffs Isidoro Rivera, Jose Alvarado, Juan Bustillo, Noberto Alvarez, Elsa Mejia

Villalobo, Brian Fredericks, Eli Chavez, Marta Villatoro, and Ana Maria Mora Gomez

(collectively, "plaintiffs") originally commenced this action alleging that: (1) defendant Village

of Farmingdale (the "Village") violated the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. (the

"FHA"); and (2) defendants Secatogue Realty, LLC ("Secatogue"), John Tosini, and Michelle

Tosini (collectively, "the Secatogue Defendants") violated the FHA, New York Executive Law §

296(6) (the "NYHRL"), and New York Real Property Law § 235-b.  On May 13, 2010, the

Village and the Secatogue Defendants filed separate motions seeking summary judgment

pursuant to Federal Rule of Civil Procedure ("Rule") 56.  By Memorandum & Order dated

March 30, 2011, the Court denied the Village's motion in its entirety.  (Docket No. 154.)  By

separate Memorandum & Order of the same date, the Court granted the Secatogue Defendants'

motion and dismissed plaintiffs' claims against them in their entirety.  (Docket No. 153.)[1]

Presently before the Court is plaintiffs' motion, made pursuant to Rule 15, seeking to

amend the Amended Complaint to "add an Exploitation Claim, under [the FHA,] 42 U.S.C. §

3604(b)," against the Secatogue Defendants.  (Not. of Mot. at 1.)  For the reasons set forth below,

plaintiffs' motion is denied.

---

[1]     The reader's familiarity with these opinions is assumed for purposes of this
Memorandum & Order.

## BACKGROUND

The following facts are taken from the proposed Second Amended Complaint ("2d Am. Compl.") and are presumed true for purposes of this motion.

### The Parties

Plaintiffs are "low-income Latinos who have Latin American ancestry and/or Spanish surnames," (2d Am. Compl. ¶ 6), and are former residents of an apartment building at 150 Secatogue Avenue (the "Building"), which is located in the Village. The Village is a municipal corporation incorporated pursuant to New York Village Law, and is located in Nassau County, New York. Secatogue is a New York limited liability company with its principal place of business in New York. Secatogue owned the Building from 1999 until July 2006. At all relevant times, John Tosini was an owner, principal, and agent of Secatogue, and Michelle Tosini was an agent for Secatogue.

### The Building and Surrounding Area

The Building is located in an area of the Village bounded by Secatogue Avenue to the east, South Front Street to the north, Elizabeth Street to the west, and Conklin Street to the south. (*Id.* ¶ 30.) Another residential building was located at 130 Secatogue Avenue, which was across the street from the Building. (*Id.*) As of 2004, the majority of the Building's tenants were Latino. (*Id.* ¶ 34.) The area surrounding the Building had "a Latino population of 56.2%" and is the only area in the Village that "does not have a majority White population." (*Id.* ¶¶ 32, 33; *see also id*. ¶ 80.)[2] Plaintiffs allege that "[i]n 2000, the 54 units at [the Building] represented 37% of

---

[2]      Elsewhere in the proposed Second Amended Complaint, plaintiffs allege that the relevant area surrounding the Building "was 63.5% Hispanic and 13.2% non-Hispanic white." (2d Am. Compl. ¶ 82.)

3

all affordable 'very low income' housing in the Village," and none of these 54 units were vacant at that time.  (*Id.* ¶ 123.)

***Interactions Between John Tosini and the Village***

Between 1999 and 2004, the Village "continuously expressed an interest in redeveloping" both the Building and its surrounding area.  (*Id.* ¶ 103.)  In 1999, John Tosini met with representatives from the Village "to discuss the Village's interest in redeveloping" the Building.  (*Id.* ¶ 99.)  During a second meeting with John Tosini, "the Village proposed condemning the area and selling it to [John Tosini] who would then redevelop it into a residential condominium complex and commercial area."  (*Id.* ¶ 100.)  In April 2000, John Tosini received a "'Public Notice' and an Acquisition Map, pursuant to New York Eminent Domain Law, and a letter from the Village Clerk, which informed him that the Village planned to take title of 130 and 150 Secatogue on September 1, 2000."  (*Id.* ¶ 101.)  Plaintiffs allege that, "[a]s a result of this threat of eminent domain," which apparently never actually came to fruition, the Secatogue Defendants "stopped making capital improvements" to the Building.  (*Id.* ¶ 104.)  According to plaintiffs, "[t]he Village's threat of eminent domain eliminated market competition and the resulting condemnation blight[ ] allowed the Secatogue Defendants to charge excessive rents for housing in substandard condition."  (*Id.* ¶ 107.)

***Alleged Condition of the Building***

Plaintiffs allege that while they lived in the Building, their apartments were "unfit for human habitation and [exhibited conditions] dangerous to life, health and safety," including mold, vermin, various leaks, defective windows, rotting wood, intermittent interruptions in heat, electricity, and hot water, and defective toilets and bathtubs.  (*Id.* ¶ 90.)  Plaintiffs also allege that

the common areas of the Building had raw sewage spills, foundation cracks, flooding, crumbling walls, water damage, holes in the ceiling, and inadequate structural support.  (*Id.* ¶ 91.)  Plaintiffs allege that John and Michelle Tosini were aware of these conditions but refused to provide any remedy.  (*Id.* ¶¶ 92, 93.)  According to plaintiffs, despite the conditions of the Building, "the Village issued only 17 summonses to [the Secatogue Defendants] for violations of the Village Code" between 1999 and 2004.  (*Id.* ¶ 110.)

***The Court's Decision on the Secatogue Defendants' Motion for Summary Judgment***

As noted above, in May 2010 the Secatogue Defendants moved for summary judgment seeking dismissal of plaintiffs' claims that they violated the FHA and NYHRL "by acting in concert with the Village to implement its discriminatory redevelopment plan."  (Docket No. 153 at 6.)  The Court granted the Secatogue Defendants' motion for summary judgment, dismissing plaintiffs' FHA and NYHRL claims and declining to exercise supplemental jurisdiction over plaintiffs' claims made pursuant to Section 235-b of New York's Real Property Law.

In its Memorandum & Order, the Court noted that plaintiffs had raised a claim under Section 3604(b) of the FHA for the first time in their summary judgment opposition papers.  (*Id.* at 12.)  Specifically, plaintiffs asserted a claim under an "exploitation theory of discrimination," and contended that defendants had taken "unfair advantage of members of a protected class in a racially segregated housing market by assessing charges for services and conditions in excess of fair market value."  (*Id.* (internal quotation marks omitted).)  In support of these assertions, plaintiffs referred the Court to allegations purportedly set forth in their Amended Complaint. Upon review of that pleading, however, it became clear that the Amended Complaint did not "plead (or even imply the existence of) such a claim."  (*Id.* at 13.)  The Court, relying on "[w]ell-

5

settled case law within this Circuit," concluded that it was "inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment." (*Id.* at 14 (internal quotation marks omitted).)

With the Court's permission, plaintiffs filed the present motion to amend the Amended Complaint to "add an Exploitation Claim, under 42 U.S.C. § 3604(b)" against the Secatogue Defendants. (Not. of Mot. at 1.)

## DISCUSSION

### I.   *Legal Standard*

Rule 15(a)(2) provides that the Court "should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (internal quotation marks omitted)). A motion to amend may be denied, however, upon a showing of the futility of the proposed amendment. *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). "[T]he standard for futility with respect to a motion to amend under Rule 15 is identical to the standard for a Rule 12(b)(6) motion to dismiss – namely, the court must determine whether the allegations in the complaint state a claim upon which relief can be granted." *Crippen v. Town of Hempstead*, 2009 WL 803117, at *1 n.1 (E.D.N.Y. Mar. 25, 2009). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II.     *Plaintiffs' Motion to Amend is Denied as Futile*

The FHA makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  Plaintiffs assert that an "Exploitation Claim" made pursuant to this statutory provision "exists when (1) as a result of racial segregation, dual housing markets exist, and (2) defendant sellers take advantage of this situation by demanding prices and terms unreasonably in excess of fair market value because of the plaintiffs' race."  (Pls.' Mem. at 8.) Plaintiffs assert that they have adequately pled an FHA exploitation claim in the proposed Second Amended Complaint by alleging that:  (1) "a segregated housing market existed in the Village and in the County of Nassau" that resulted in "Hispanics liv[ing] in a highly-concentrated pocket community around [the Building]," (2) "the rents Plaintiffs paid to the Secatogue Defendants were in excess of fair market value because the Defendants failed to provide and maintain each apartment in its warranted habitable condition," and (3) "the threat of eminent domain of [the Building], the Village's inadequate code enforcement, the lack of alternative affordable housing, and the Plaintiffs' lack of sophistication created a non-competitive market allowing the Secatogue Defendants to exploit the Hispanic rental market in the Village."  (*Id.* at 9.)

The Seventh Circuit developed the exploitation theory upon which plaintiffs rely, and applied that theory to claims brought pursuant to 42 U.S.C. § 1982.[3]  As the Seventh Circuit

---

[3]     Section 1982 provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.

described, a plaintiff could establish a prima facie case of Section 1982 liability under one of two

separate tests: "the 'traditional' and the 'exploitation' tests of discrimination." *Clark v.*

*Universal Builders, Inc.*, 706 F.2d 204, 207 (7th Cir. 1983) ("*Clark II*"). To make out a prima

facie case under the "traditional" theory:

> there must be a showing of treating, in similar circumstances, a
> member or members of one race different from the manner in which
> members of another race are treated. That is, a black prospective
> buyer of a dwelling demonstrates discriminatory conduct if he proves
> that an owner utilizes different pricing policies with respect to blacks
> and whites similarly situated.

*Clark v. Universal Builders, Inc.*, 501 F.2d 324, 336 (7th Cir. 1974), *cert. denied*, 419 U.S. 1070

(1974) ("*Clark I*"). Under the "exploitation theory" of liability, which the Seventh Circuit

recognized for the first time in *Clark I*, a plaintiff "state[s] a claim under section 1982" if he

alleges:

> that (1) as a result of racial residential segregation dual housing
> markets exist and (2) defendant sellers took advantage of this
> situation by demanding prices and terms unreasonably in excess of
> prices and terms available to white citizens for comparable housing.

*Id.* at 334.[4]

Plaintiffs assert that their proposed amendment "would not be futile because Plaintiffs

can establish their Exploitation Claim against [the] Secatogue Defendants." (Pls.' Mem. at 8.)

As an initial matter, the Court notes that the Seventh Circuit developed and applied the

exploitation theory of liability to claims made pursuant to Section 1982 – not the FHA. Plaintiffs

---

[4]     The Seventh Circuit further set out that "[i]f plaintiffs sustain the burden of proof
on these elements they make out a prima facie case, whereupon, as recently made clear by the
Supreme Court, the burden of proof shifts to the defendants 'to articulate some legitimate,
nondiscriminatory reason' for the price and term differential." *Clark I*, 501 F.2d at 334 (quoting
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

have offered no explanation why it would be appropriate for this Court to apply the exploitation theory of liability to FHA claims.[5]  Moreover, plaintiffs have cited no authority to demonstrate that the Second Circuit even recognizes an "exploitation theory" of liability under any statute.[6] The Court's own research has not uncovered any decisions from courts by or within the Second Circuit adopting this theory (or some variant thereof) or otherwise applying the reasoning and rationale of the Seventh Circuit.  Plaintiffs have not addressed these issues and, thus, have failed to establish that an FHA claim made pursuant to an exploitation theory of liability is even a cognizable claim in the Second Circuit.

However, even assuming *arguendo* that an exploitation theory of liability applies to claims made pursuant to the FHA and that the Second Circuit does (or would) recognize this theory, the Court finds that plaintiffs' proposed amendment is still futile because plaintiffs' allegations are insufficient to plead an exploitation claim.  As noted above, the Seventh Circuit

---

[5]      Plaintiffs cite *Honorable v. Easy Life Real Estate System*, 100 F. Supp. 2d 885, 887 (N.D. Ill. 2000) for the proposition that an "Exploitation Claim exists" under the FHA.  (*See* Pls.' Mem. at 8.)  In *Honorable*, the plaintiffs – "African-Americans who sought to buy rehabbed homes offered for sale by the defendants in or near the predominately black Austin area on the west side of Chicago, Illinois" – alleged that the defendants' selling practices violated 42 U.S.C. §§ 1981 and 1982 as well as the FHA.  *Id.* at 886.  Although it is not entirely clear from the opinion, it appears that the only claims plaintiffs made pursuant to the FHA were their "intentional discrimination claims about 'reverse redlining,'" i.e., "the practice of extending credit on unfair terms" to "specific geographic areas due to the income, race, or ethnicity of its residents."  *Id.* at 892 (noting "[t]hese sort of practices come within the ambit of the Fair Housing Act").  The Court reads the opinion of the *Honorable* court as applying the "exploitation theory" only to the plaintiffs' remaining claims made pursuant to Sections 1981 and 1982.

[6]      Prior to *Clark I*, the Seventh Circuit had never addressed the question of "whether section 1982 covers only the so-called traditional type of discriminatory conduct, or whether a claim may be stated under section 1982 by proof of exploitation of a discriminatory situation already existing and created in the first instance by the action of persons other than defendants." *Clark I*, 501 F.2d at 328.  It does not appear that the Second Circuit has addressed this specific question.

has made clear that in order to plead a claim under an exploitation theory, plaintiffs must allege "that (1) as a result of racial residential segregation dual housing markets exist and (2) defendant sellers took advantage of this situation by demanding prices and terms unreasonably in excess of prices and terms available to white citizens for comparable housing." *Clark I*, 501 F.2d at 334. In addition, plaintiffs are required to show "how [those] allegedly unreasonable prices could have been maintained against the presumably reasonable prices of the competition." *Clark II*, 706 F.2d at 212.  Even assuming that plaintiffs' allegations are sufficient to establish the first two elements, their claim still fails because they have failed to adequately plead the third.  That is, they have failed to present an "economically credible explanation of how an exploiter can stay in business charging above-market prices." *Honorable*, 100 F. Supp. 2d at 887.

One way plaintiffs could potentially plead this element would be to allege that the Secatogue Defendants "had a sufficient market share to shelter them from the pressures of competition." *Clark II*, 706 F.2d at 211.  Plaintiffs do not make any such allegation here.[7] Rather, they allege that a lack of affordable alternative housing forced them to stay in the Building despite its "deplorable conditions."  (2d Am. Compl. ¶¶ 126, 127.)  However, to paraphrase the Seventh Circuit, even if the Court were to "fully accept the proposition that [Latinos] were completely restricted to the particular geographical housing market in which [the Secatogue Defendants] were operating," plaintiffs still must allege "how defendants could have in fact charged higher prices or demanded more restrictive terms than their competitors in that

---

[7]      The Court notes that in their summary judgment opposition papers, plaintiffs did assert that the Secatogue Defendants "controlled a dominant share of the rental market available to Hispanics which allowed them to take advantage of Plaintiffs." (Pls.' Summ. J. Opp'n at 15.) They have not made any such allegation in the proposed Second Amended Complaint, however, and appear to have abandoned that assertion.

particular location." *Clark II*, 706 F.2d at 211.  Plaintiffs have failed to do so.

Plaintiffs also assert that their "lack of sophistication created a non-competitive market allowing the Secatogue Defendants to exploit the Hispanic rental market in the Village." (Pls.' Mem. at 9; *see also* 2d Am. Compl. ¶¶ 128-31.)  Plaintiffs allege that because they "do not speak, read, or write English," they "lack the information, confidence, and experience to be 'normal' consumers."  (2d Am. Compl. ¶¶ 128, 129.)  Although these allegations are similar to those made in *Honorable*, 100 F. Supp. 2d at 888, that case is significantly distinguishable.  There, the plaintiffs alleged that "the defendants were able to exploit African-Americans by carving out a noncompetitive enclave in the market."  *Id.*  Specifically:

> Whether or not the defendants had market power in the relevant market, they were able to retain their market share and persist in these practices while charging above-market prices by, in effect, taking the unsophisticated, first-time minority buyers who had the misfortune to fall into their clutches out of the competitive market by deceptively making these buyers wholly dependant upon them for the mechanics and wherewithal of home-buying, controlling their access to potential properties, loans, down payments, attorneys, and all their information.

*Id.*  The allegations in this case, i.e., that "language and cultural barriers made it difficult for the Plaintiffs to complain about the conditions they were living in," (2d Am. Compl. ¶ 130), are a far cry from the "pattern of deception and misrepresentation" at issue in *Honorable*.  *See Honorable*, 100 F. Supp. 2d at 888.

Plaintiffs' remaining allegations that the Village's "threat of eminent domain" and inadequate enforcement of the Village Code "created a distorted market" between 1999 and 2004 (*see* 2d Am. Compl. ¶¶ 107, 113) really go to the first element – the existence of dual housing markets – and do not explain "how [the Secatogue Defendants] could have in fact charged higher

11

prices or demanded more restrictive terms than their competitors in that particular location." *See Clark II*, 706 F.2d at 211.

Thus, plaintiffs' motion to amend the Amended Complaint to assert a so-called "exploitation claim" against the Secatogue Defendants pursuant to the FHA is denied as futile[8] for several reasons. First, plaintiffs have made no attempt to explain why the exploitation theory of liability, developed by the Seventh Circuit in connection with its analysis of Section 1982 claims, is applicable to FHA claims made in this Circuit. Second, plaintiffs have failed to sufficiently allege an essential element of an exploitation claim, to wit, an "economially credible explanation of how an exploiter can stay in business charging above-market prices." *See Honorable*, 100 F. Supp. 2d at 887.[9]

---

[8] Because plaintiffs' motion to amend is denied on the grounds of futility, the Court need not address the Secatogue Defendants' arguments regarding prejudice and undue delay.

[9] Plaintiffs argue, in the alternative, that their motion to amend should be granted because the Secatogue Defendants consented to the inclusion of an exploitation claim by addressing that claim – raised for the first time in plaintiffs' summary judgment opposition papers – in their reply memorandum submitted in further support of summary judgment. (Pls.' Mem. at 6-7.) Plaintiffs also point to the Secatogue Defendants' failure to object to plaintiffs' inclusion of that claim in the Joint Pretrial Order, which was filed before the Court issued its order dismissing the claim on summary judgment, as evidence of their consent. (*Id.* at 3-5.) As noted in the text above, it is questionable whether plaintiffs' exploitation claim is recognized by the Second Circuit and, in any event, it has been insufficiently alleged. Simply put, any purported "consent" by the Secatogue Defendants to the inclusion of a legally unsound claim is not binding on this Court.

*CONCLUSION*

For the reasons set forth above, plaintiffs' motion to amend the Amended Complaint is denied.  The case will proceed to trial as against the Village only.  (*See* Docket No. 154.)  The Court will issue a separate Scheduling Order setting forth the details for the Final Pre-Trial Conference.

**SO ORDERED.**

Dated: Central Islip, New York
      February 19, 2013                                 __/s/_____
                                                 Denis R. Hurley
                                                 Unites States District Judge