UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

ISIDORO RIVERA, *et al.*,

                Plaintiffs,

     -against-

THE INCORPORATED VILLAGE OF
FARMINGDALE,

               Defendant.

----------------------------------------------------------------x

**MEMORANDUM & ORDER
ON DEFENDANT'S MOTION
*IN LIMINE***

06-CV-2613 (PKC)

PAMELA K. CHEN, United States District Judge:

This Court presumes the parties' familiarity with the facts in this case, particularly as they pertain to the claims against Defendant the Incorporated Village of Farmingdale (the "Village").[1]  In essence, Plaintiffs claim that, in violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., the Village carried out a redevelopment plan for an area populated predominantly by Latinos, intending to discriminate against or, at the very least, having a discriminatory impact on its Latino residents.  Plaintiffs' specific allegation is that, pursuant to this plan, the Village facilitated Fairfield Acquisition, LLC's ("Fairfield") privately-funded renovation of—thereby forcing Latino residents, including Plaintiffs, to vacate—a rental apartment building in that area (the "Building" or "150 Secatogue Avenue").  *See generally Rivera*, 784 F. Supp. 2d 133.

---

[1]     Judge Denis R. Hurley, who was previously assigned to this case, detailed the facts relating to the claims against the Village in several of his decisions. *See, e.g.*, *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133 (E.D.N.Y. 2011) (Hurley, J.) (denying the Village's summary judgment motion).

The parties have litigated this case for more than seven years, and are finally ready to go to trial. In anticipation of a projected six-week trial, scheduled to begin on January 13, 2014, the Village has filed an omnibus motion to exclude evidence (Dkt. No. 194).[2] For the reasons set forth below, the Village's motion is GRANTED in part and DENIED in part.

I. Discussion

A. *Standard of Review*

A motion *in limine* lies in this Court's "inherent authority to manage the course of its trials." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (Leisure, J.). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quotations omitted).

The Federal Rules of Evidence provide that "[r]elevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 402. Even relevant evidence should be excluded, however, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Id.* at 403.

---

[2] In addition, Plaintiffs have filed two *Daubert* motions (Dkt. Nos. 199; 202) and a motion to permit leading questions on direct examination (Dkt. No. 205). This Court will separately address Plaintiffs' three motions at the final pre-trial conference, scheduled for January 7, 2014.

*B. Evidence Regarding the Secatogue Avenue Redevelopment Plan ("SARP"), Traffic Enforcement Policies, Day Laborers, and Financing of the Building*

The Village categorically challenges the admission of evidence regarding (i) the SARP (Dkt. No. 196 ("Vill. Br."), at 14-17); (ii) traffic enforcement policies (*id.* at 18-20); (iii) day laborers (*id.* at 8-9); and (iv) financing for the purchase and renovation of the Building by Fairfield (*id.* at 21). As the Village contends, any evidence in the above categories raises dual admissibility concerns, *i.e.*, that such evidence is (i) irrelevant and/or (ii) confusing, misleading, and prejudicial.

The Village's categorical challenges are little more than a veiled attempt to relitigate findings that Judge Hurley made in denying the Village's summary judgment motion. The Village will not be permitted to invalidate Judge Hurley's findings indirectly through a motion *in limine*. *See NIC Holding Corp. v. Lukoil Pan Ams.*, No. 05-CV-9372, 2009 WL 996408, at *2 (S.D.N.Y. Apr. 14, 2009) (holding that the court "will not indulge [the moving party's] efforts to revive its unsuccessful summary judgment arguments" in a motion *in limine*) (collecting cases); *U.S. Underwriters Ins. Co. v. Falcon Constr. Corp.*, No. 02-CV-4182, 2006 WL 3146422, at *3 (S.D.N.Y. Oct. 30, 2006) ("[The defendant's] motion attempts to relitigate an issue already decided by the Court. This is an improper use of an *in limine* motion. If [the defendant] wanted to contest the legal conclusions in the Court's [decision denying its summary judgment motion], it should have filed a timely motion for reconsideration.").[3]

---

[3]      *See also Williams v. Johnson*, 747 F. Supp. 2d 10, 16 (D.D.C. 2010) (denying the plaintiff's motion *in limine*, which "recycle[d] the very same argument" in her partial summary judgment motion that the district court already "rejected"); *Sparks v. Susquehanna Cnty.*, No. 05-CV-2274, 2009 WL 1598125, at *2 (M.D. Pa. June 5, 2009) ("The court has already addressed this question in relation to defendants' motion for summary judgment, concluding that the question . . . should be left to the jury. . . . Since a motion in limine is not a proper place to reargue a motion for summary judgment, the court will deny [the defendants' motion *in limine*].");  *EEOC v. Schott N. Am., Inc.*, No. 06-CV-1246, 2009 WL 310897, at *2 (M.D. Pa.

In denying summary judgment, Judge Hurley found that, with respect to whether Plaintiffs had standing to bring claims based on the Village's alleged redevelopment plan:

> [G]enuine issues of fact do exist as to the role the Village played in Fairfield's renovation of the Building, whether via a formal redevelopment plan such as the SARP or a more informal course of action taken to achieve the Village's desired redevelopment result.

*Rivera*, 784 F. Supp. 2d at 139. Even though the Village insisted that Plaintiffs lacked such standing, in that it never enacted the SARP through its "legislative body," there was, at the very least, an issue of whether it reached the same result intended by the SARP through some "informal" process. *Id.* at 139-41. The SARP would be significant in proving Plaintiffs' standing, whether it was enacted formally or informally. The Village cannot use its motion *in limine* now to undo this finding, by again arguing that Plaintiffs "should be precluded from referring to SARP" which was "nothing more than a concept or idea" (Vill. Br., at 14).[4]

Judge Hurley also found an issue of fact for trial with respect to the discriminatory intent that the Village purportedly possessed when implementing its alleged redevelopment plan. *Rivera*, 784 F. Supp. 2d at 147, 153. This finding was premised on, among other things, the fact that pre-existing issues with the presence of day laborers in the Village, and the Village's increasing efforts to employ traffic enforcement policies to resolve these issues, supported a context in which such intent likely informed the adoption of the alleged redevelopment plan. *Id.*

---

Feb. 5. 2009) (agreeing that the defendant was "merely attempting to reargue the meaning of evidence in its motion in limine," even though it already "had an opportunity to argue that these plaintiffs lacked evidence to support their claims in its motion for summary judgment").

[4] Nor is there any reason to require Plaintiffs to refer only to the SARP as a "concept or idea," and not as a plan "enacted or implemented" (Vill. Br., at 15; *see* Dkt. No. 217 ("Vill. Reply"), at 4-5). Presumably, Plaintiffs will try to prove that the Village "enacted or implemented" the SARP either formally or informally, and the Village will seek to disprove this fact. As Judge Hurley found, it is for the jury to decide whether the SARP was simply a "concept or idea." The instructions to the jury will further clarify that nothing that Plaintiffs say, such as any statement that the SARP was "enacted or implemented," constitutes evidence.

at 147-49; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (Powell, J.) (holding that, in inferring the intent regarding a racially-discriminatory housing decision, the "historical background of the decision" is relevant). Although these activities centered on "day laborers congregating near the Building," and Plaintiffs "are not day laborers themselves," Judge Hurley ruled that, because the Village's day laborers were predominantly Hispanic and treated as synonymous with its Hispanic population, a "reasonable juror could find" that these activities reflected an "anti-Hispanic element." *Rivera*, 784 F. Supp. 2d at 149-50. The present motion by the Village simply rehashes its earlier argument that the Village's activities pertained solely to day laborers, and not its Hispanic residents or the availability of housing in the Village (Vill. Br., at 8-9, 18-20). This argument ignores Judge Hurley's prior finding that, even though these activities otherwise involved day laborers, they could still support an inference of discriminatory intent, viewed in the overall context.

Finally, Judge Hurley's finding of a triable issue with respect to intent was reinforced further by the fact that the Village allegedly failed to require Fairfield to bring the Building into conformity with the building code, even though the renovation exceeded 50% of the Building's value. As Judge Hurley explained, this failure constituted one of the Village's disputed "[d]epartures from [n]ormal [p]rocedure" from which its discriminatory intent is possibly inferred. *Rivera*, 784 F. Supp. 2d at 150-52; *see also Vill. of Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."). The Village voices its dissatisfaction with this finding by trying to block the very evidence, *i.e.*, evidence of the "extent of mortgages taken out by Fairfield" to purchase and renovate the Building (Vill. Br., at 21), which would permit Plaintiffs to prove that the Village failed to follow "[n]ormal [p]rocedure." As Plaintiffs argue, such evidence will show

that Fairfield procured (i) a mortgage greater than the Building's purchase price, purportedly to cover "extensive renovation costs," and (ii) a specific loan for renovating the Building; and that, given the amount of financing for the renovation, Fairfield's conformity with the building code should have been required. (Dkt. No. 211 ("Pls. Opp."), at 20-21.)

Accordingly, this Court denies the Village's motion to categorically exclude the evidence identified above, since it directly conflicts with Judge Hurley's prior findings that such evidence is relevant to resolving disputed issues of material fact in Plaintiffs' case against the Village.

### C. *Evidence Regarding the Bartone Project*

The Village contends that another category of evidence regarding the redevelopment of a separate property at 120 Secatogue Avenue, also called the "Bartone Project,"[5] similarly raises dual admissibility concerns. (Vill. Br., at 30-31; *see* Vill. Reply, at 10.) Allegedly, the Bartone Project is privately-funded, but has been approved by the Village, and proposes to replace a non-residential warehouse with a "mixed-use development (commercial space on the ground level and residences above)." (Vill. Br., at 30.)

The Village's dispute over the admissibility of the Bartone Project evidence is no different than its dispute over the admissibility of evidence about the SARP's existence. This Court already considered, and rejected, the contention that the existence of the SARP is irrelevant, since the Village did not formally enact it. *See supra* discussion at Section I.B. There is no reason now to exclude other evidence relevant to a finding that the SARP was enacted.

Plaintiffs argue that the Bartone Project evidence will show that, in fact, the SARP was enacted, be it formally or informally. (Pls. Opp., at 32-34.) The project, unlike the renovation of

---

[5] (*See* JPTO Pls. Exs. 537-56.) "JPTO Pls. Ex." denotes Plaintiffs' exhibits listed in the joint pre-trial order (Dkt. No. 190) and submitted with the Village's omnibus motion as "Exhibit L."

the Building, (i) does not propose to deplete affordable housing options, in that "there are no and have never been residential structures" at 120 Secatogue Avenue; and (ii) seeks to allocate 10% of the new residences as "workforce/affordable housing." (Vill. Br., at 30-31; *see* Vill. Reply, at 10.) However, the project purportedly "*perpetuates* the depletion of available affordable housing," and therefore is possibly related to the same alleged redevelopment plan as the renovation of the Building. (Pls. Opp., at 34-35 (emphasis added).)

Accordingly, this Court denies the Village's motion to exclude evidence regarding the Bartone Project. The possible relationship between the project and the Building's renovation is relevant—and, by no means, confusing, misleading, or prejudicial—in proving that the Village carried out its alleged redevelopment plan against Hispanic residents, including Plaintiffs.

### D. *Newspaper Articles & Internet Postings*

#### 1. Hearsay

The Village argues for the exclusion of newspaper articles and internet postings, by reciting a general rule that these materials, as hearsay, are "not covered by any exception." (Vill. Br., at 2-5 (quotations omitted); *see* Vill. Reply, at 1-2.)

The Village's preoccupation with this rule truly misses the proverbial forest for the trees: before deciding that the hearsay exceptions do not apply, the first question is whether these materials even constitute hearsay. *See Munafo v. Metro. Transp. Auth.*, Nos. 98-CV-4572, 00-CV-134, 2003 WL 21799913, at *16 (E.D.N.Y. Jan. 22, 2003) (Korman, C.J.) ("While defendants are correct that as a general matter, newspaper articles are inadmissible to prove the truth of their contents, . . . they may be used for other relevant non-hearsay purposes.") (citation omitted). If these materials (i) are not being introduced for a hearsay purpose, *i.e.*, "to prove the truth of the matter[s] asserted," Fed. R. Evid. 801(c) (defining "hearsay"), or (ii) are otherwise excluded from the definition for hearsay, *id.* at 801(d) (defining "[s]tatements [t]hat [a]re [n]ot

[h]earsay"); then they are not hearsay, and no such exception is needed. *See U.S. v. Kone*, 216 F. App'x 74, 76 (2d Cir. 2007) ("[The defendant's] statements . . . were not within the definition of hearsay, . . . and hence were not excludable as hearsay regardless of whether they would fall . . . under an exception to the hearsay rule.") (citation omitted); *Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005) (noting that "[o]ffering evidence under [a hearsay exception] is different than offering it for a non-hearsay purpose," and that such an exception is only "invoked when the statement is offered for the truth of the matter asserted").

For the most part, the articles and postings that Plaintiffs propose to put forth at trial may serve relevant non-hearsay purposes; in which case, the application of the hearsay rule, and its exceptions, is inapposite. As Plaintiffs point out, many of these materials[6] will show that, historically, Hispanic day laborers, gangs, and immigrants, and their purported effect on the Village, were subjects of concern and hostility in the community. (Pls. Opp., at 4.) What matters is not that the concern and hostility, as reflected in these materials, were real or accurate, but that their mere expression could have set the tone and thus shaped the Village's discriminatory purpose behind its alleged redevelopment plan. *See Munafo*, 2003 WL 21799913, at *16-17 (holding that an article reflecting the plaintiff's "public criticisms" were admissible for the non-hearsay purpose of showing the defendants' "motive for retaliating against him"); *Roniger v. McCall*, 119 F. Supp. 2d 407, 410 (S.D.N.Y. 2000) (holding that articles about a prior incident were not hearsay, if offered to prove the defendant's "state of mind" when firing the plaintiff for *another* incident, which also revealed a "compromised political independence" between the defendant and the mayor); *Jackson v. Jimino*, 506 F. Supp. 2d 105, 113-14 (N.D.N.Y. 2007) (denying reconsideration of a summary judgment decision

---

[6]     (*See* JPTO Pls. Exs. 192-94, 208-12, 368, and 438-40.)

based on its reference to "negative publicity" in several articles, because "most importantly" these articles "reflect the state of mind of [the defendant], who decided not to re-appoint [the plaintiff]"); *accord Yarborough v. City of Warren*, 383 F. Supp. 676, 682 (E.D. Mich. 1974) (noting that a "series of newspaper articles" were "ostensibly concerned with the issue of motivation," but that, where the housing discrimination claims were based on disparate impact, motivation was not a "subject for inquiry"; and holding that these articles were still admissible "as evidence of the 'historical context'" in which the purported discrimination occurred).

Indeed, Judge Hurley himself relied on these materials to show that comments contained therein suggested a "climate of extreme public anti-Hispanic sentiment," from which a jury could infer that the Village deliberately devised its alleged redevelopment plan for the same discriminatory reasons. *Rivera*, 784 F. Supp. 2d at 147-48; *see also Vill. of Arlington Heights*, 429 U.S. at 267 ("historical background"). Judge Hurley's reliance on these materials at the summary judgment stage rebuts any argument that they are only inadmissible hearsay. *See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) ("On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial."). This Court agrees with Judge Hurley that, at trial, these materials should be admissible not to prove the truth of their contents, but to contextualize the Village's intent in creating this alleged plan.

Plaintiffs similarly state that several other of the proposed articles[7] are admissible only to show that the Village had "notice" of the "heated public controversy" surrounding the proposal to renovate the Building and its potential impact on the Village's Hispanic residents, and not to show the truth of the matters that these articles assert. (Pls. Opp., at 4.) While it would be

_____

[7]     (*See* JPTO Pls. Exs. 177, 182-83, 294, 335, 349, 351, 513, and 516.)

inappropriate to admit these articles to show that there actually *was* such a controversy, they are admissible for the more limited purpose of showing that the Village itself knew or believed there was a controversy, yet still allowed the renovation to proceed according to its alleged redevelopment plan.[8] *See Munafo*, 2003 WL 21799913, at *17 (holding that the same article was also admissible for the non-hearsay purpose of showing "defendants' knowledge of the substance of [the plaintiff's] public criticisms"). Put simply, such a controversy, and the Village's awareness of it, could potentially support another inference about its intent to pursue this allegedly discriminatory plan. *See Vill. of Arlington Heights*, 429 U.S. at 267 (holding that the "specific sequence of events leading up [to] the challenged decision" is also relevant).

As for the remainder of the proposed articles, Plaintiffs acknowledge that they *are* being "offered for the truth of the matter asserted," *i.e.*, a hearsay purpose, but only for specific statements therein that are otherwise excluded from the definition for hearsay. (Pls. Opp., at 5.) According to Plaintiffs, these statements are ones that then-mayor, George Graf, made, as the Village's "agent or employee on a matter within the scope of that relationship and while it existed," which, when "offered against [the Village]," do not amount to inadmissible hearsay. Fed. R. Evid. 801(d)(2)(D); (Pls. Opp., at 5). There is no doubt that articles authored by Graf, during his tenure as mayor,[9] are admissible in their entirety as statements of a party-opponent. *See Seashock v. Harris Corp.*, No. 88-CV-2067, 1989 WL 36403, at *1-2 (E.D. Pa. April 11,

---

[8]     If necessary, a limiting instruction could be given at trial to minimize any prejudice or confusion. *See, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, No. 02-CV-8098, 2008 WL 3884363, at *11 (S.D.N.Y. Aug. 20, 2008) (Leisure, J.) (holding that a "limiting instruction to the jury regarding evidence admitted under the state of mind exception to the hearsay rule" would have "cured any potential unfair prejudice that defendants might have suffered"), *rev'd on other grounds*, 607 F.3d 322 (2d Cir. 2010); *cf. U.S. v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").

[9]     (*See* JPTO Pls. Exs. 180, 346, and 348.)

1989) (admitting a "1957 article" under Fed. R. Evid. 801(d)(2)(D), as the author was a "manager of [the defendant company], at the time he authored the article").

Articles that contain quotations from Graf, but are authored by someone else,[10] present a more complex question of admissibility. Graf's quotations, like the articles he personally authored, are statements of a party-opponent that fall outside the definition for hearsay; however, their "repetition in the newspapers" raises a separate hearsay issue, in that it reflects the "implicit statement" of *other* out-of-court declarants, *i.e.*, the reporters, that Graf actually said those things. *Larez v. City of L.A.*, 946 F.2d 630, 642 (9th Cir. 1991). For one of these articles (JPTO Pls. Ex. 181), the double-hearsay problem is resolved by the fact that Graf also "adopted" the quotation, as repeated in the article, during his deposition (Pls. Opp., Ex. 2, at 151:18-24 (adopting quotation in JPTO Pls. Ex. 181)). Fed. R. Evid. 801(d)(2)(B) & 805; *see Tracinda Corp. v. Daimlerchrysler AG*, 362 F. Supp. 2d 487, 495 (D. Del. 2005) (admitting "statements [the defendant] made . . . that were printed in *The Financial Times* article" as "admissions of a party opponent," and not hearsay, because he "adopted" the printed statements during his deposition); *Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1050 (N.D. Cal. 2006) (Larson, Mag. J.) (holding that the police chief's statements, as quoted in an article, were "admissible as evidence," since the police chief, during his deposition, "replied that he did" make the statements); *cf. Mandal v. City of N.Y.*, Nos. 02-CV-1234, 02-CV-1367, 02-CV-6537, 2006 WL 3405005, at *2 (S.D.N.Y. Nov. 26, 2006) (admitting the "portions of the [reporter's] Articles and Notes that contain direct quotations or attribute specific statements to individual Defendants or their agents," where nobody "directly denie[d] having made any of the statements attributed to

---

10      (*See* JPTO Pls. Exs. 179, 181, and 447.)

them"). Plaintiffs, however, have failed to prove that Graf similarly "adopted," during his deposition, the quotations that appear in the other articles (JPTO Pls. Exs. 179 and 447).

Accordingly, this Court denies the Village's motion to exclude proposed articles and postings as hearsay, *except* with respect to the two articles identified as JPTO Pls. Exs. 179 and 447. If, at trial, Plaintiffs offer certain of these materials for purposes other than the ones that this Court has already considered as relevant non-hearsay, or are able to prove that Graf adopted the quotations attributed to him in JPTO Pls. Exs. 179 and 447, this Court may revisit the admissibility of these articles.

### 2. Authentication

The Village argues that, even assuming the internet postings are admissible for the relevant non-hearsay purpose of establishing the context that possibly precipitated the creation of its alleged redevelopment plan, they should be excluded for lack of authentication. (Vill. Br., at 7-8; *see* Vill. Reply, at 2.)

The "bar for authentication" of the internet postings is "not particularly high," *i.e.*, a "reasonable likelihood" standard. *U.S. v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (quotations omitted). "The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard." *Id.* (citing Fed. R. Evid. 901(b)(1)). As long as such testimony is sufficient, these postings should be admitted, "notwithstanding that [they] were editable." *Id.* (admitting the defendant's "e-mails and transcripts of instant-message chats," despite his claim that these messages were "not originals and could have been subject to editing," as third-party testimony indicated that these messages "were in fact accurate records").

Plaintiffs represent that Janet Liotta, described as an "advocate[] on behalf of the Village's Latino community," will testify that these posting are authentic, because she personally "downloaded all of the postings and confirmed the identities of the key posters." (Pls. Opp., at

8-9, 29.)  Liotta's testimony could suffice to authenticate these postings, by showing a "reasonable likelihood" that they were actually posted on the internet by members of an online community comprised of the Village's own residents.[11]  *Gagliardi*, 506 F.3d at 151 (quotations omitted).

Accordingly, this Court denies the Village's motion to exclude the internet postings that Plaintiffs intend to offer at trial on the basis of authentication.  If Plaintiffs are unable to authenticate these postings at trial, the Village may renew its objection.

### 3.  Relevance

Apart from the challenges already raised and discussed *supra* at Section I.B, the Village also challenges, as irrelevant, three specific newspaper articles (JPTO Pls. Exs. 208-209 and 351), which deal with "occurrences that did not take place in the Village."  (Vill. Br., at 6.)

Although one article (JPTO Pls. Ex. 351) reflects a larger controversy over how other parts of Long Island were treating Latinos, it also references a controversy in the Village over an incident of "Latinos [being] forced to flee their home," as a result of attacks against them for their participation in a "candlelight vigil for the Virgin of Guadalupe."  (JPTO Pls. Ex. 351.) The article is relevant for this reference, because it tends to prove that the Village was aware that, by continuing to encourage the Building's renovation at the expense of its Hispanic residents, it would engender similar controversy.  *See supra* discussion at Section I.D.1.

With respect to the two other articles (JPTO Pls. Exs. 208-209), Plaintiffs argue that the articles are relevant, because they raise concern over "Latino gang-related violence in towns adjoining the Village." (Pls. Opp., at 7.)  Plaintiffs' argument is unpersuasive.  Absent evidence

---

[11]     Liotta's testimony could also suffice to authenticate the "leaflet" (JPTO Pls. Ex. 446), to which the Village objects (Vill. Br., at 8), in that "she helped create the leaflet."  (Pls. Opp., at 8.)

that the Village was concerned about these activities in the adjacent towns, their probative value is minimal, while the potential prejudice and confusion that would result from their admission is significant.

Accordingly, this Court denies the Village's motion to exclude the article identified as JPTO Pls. Ex. 351, but grants the motion as to the two articles identified as JPTO Pls. Exs. 208-209.  If Plaintiffs proffer the former for a purpose for which it is not relevant, or demonstrate that the latter are relevant for some purpose, this Court may revisit these determinations.

### E.  Photographs

#### 1.  Photographs of the Building's Conditions

The Village attempts to preclude Plaintiffs from introducing photographs of the conditions in and around the Building,[12] both pre- and post-renovation.[13]  (Vill. Br., at 11; *see* Vill. Reply, at 2-3.)  According to the Village, these photographs are irrelevant, in that it neither owned the Building nor was it obligated to maintain the Building, and, to that end, they might be confusing, misleading, and prejudicial.  (Vill. Br., at 11-13; *see* Vill. Reply, at 2-3.)

This argument, however, again seeks to erase Judge Hurley's prior findings.  (Pls. Opp., at 11); *see supra* discussion at Section I.B (collecting cases).  Judge Hurley found that whether the Village departed from normal procedure, by dismissing code violation summonses for the

---

[12]     (*See* JPTO Pls. Exs. 42, 77, 80, 82-95, 97-101, 103-17, 119-20, 147-52, 172-74, 176-78, 184, 215-17, 424-34, 452, 465-68, 519-20, and 524-25.)

[13]     At present, this Court is unable to assess where and when the countless photographs were actually taken, *i.e.*, their authenticity, and refrains from conducting this assessment until Plaintiffs attempt to introduce them at trial.  *See Wechsler v. Hunt Health Sys., Ltd.*, No. 94-CV-8294, 2003 WL 21998985, at *2 (S.D.N.Y. Aug. 22, 2003) (Leisure, J.) ("[T]he Court will reserve judgment on [the authentication matter] until plaintiff seeks to offer these documents into evidence."); *see also Wright v. Mariner Health Care, Inc.*, No. 06-CV-169, 2008 WL 2704034, at *2-3 (S.D. Miss. July 3, 2008) (agreeing that "the defendants' objections to the authenticity of the photographs are premature and should be reserved until the plaintiff has had an opportunity to offer foundational and authenticating testimony at trial").

Building without inspecting to see if the violations persisted, is a triable issue of fact material to the issue of the Village's allegedly discriminatory intent. *Rivera*, 784 F. Supp. 2d at 151. Here, the Village repackages its objections to these findings into an attack on the admissibility of photographs which, based on their purported timing, are arguably relevant to prove the alleged departure from normal procedure.[14] These photographs possibly show pre-renovation building code violations between October 2004 and September 2005, when the summonses were in place; and the persistence of these violations, in part, after the dismissal of the summonses in September 2005.

Accordingly, this Court denies the Village's motion to exclude the photographs of the Building's conditions on relevance grounds. Plaintiffs, of course, will have to properly authenticate each of these photographs before they are admitted at trial.

### 2. Other Photographs

The Village also attempts to preclude Plaintiffs from introducing photographs of "Community Activity"[15] and photographs of "parking restrictions."[16] (Vill. Br., at 13.) The former refers to images in which its Hispanic residents, including Plaintiffs, are "eating and socializing." (*Id.*) The latter refers to images reflecting the restrictions "in front of 150 Secatogue Avenue," pursuant to its traffic enforcement policies. (*id.*; *see* Pls. Opp., at 14.) The Village argues that all of these photographs are irrelevant. (Vill. Br., at 13.)

---

[14]  The above fact, which Judge Hurley found relevant in raising a factual issue for trial, has nothing to do with ownership or an obligation to maintain the Building. Thus, the Village's argument about the inadmissibility of these photographs, based on such considerations, clearly contradicts Judge Hurley's finding or, at the very least, ignores it.

[15]  (*See* JPTO Pls. Exs. 441-45 and 448-50.)

[16]  (*See* JPTO Pls. Exs. 522 and 526-34.)

i. Photographs of "Parking Restrictions"

The Village presumably objects to the "parking restrictions" photographs for the same reasons it objects to any evidence relating to the Village's traffic enforcement policies. As discussed *supra* at Section I.B, the Village's objections to this category of evidence as a whole is an improper challenge to Judge Hurley's prior findings, particularly his finding that the employment of traffic enforcement policies against day laborers is relevant to the Village's intent with respect to its alleged redevelopment plan. As previously discussed, the Village cannot negate Judge Hurley's finding now by seeking, via a motion *in limine*, to bar the very evidence that pertains to these traffic enforcement policies, such as the photographs reflecting parking restrictions in front of 150 Secatogue Avenue. *See supra* discussion at Section I.B. As Plaintiffs explain, these photographs will "aid[]" testimony about the fact that traffic enforcement policies "targeted" day laborers. (Pls. Opp., at 14.)

ii. Photographs of "Community Activity"

The Village also takes issue with the "Community Activity" photographs, claiming that such activity is irrelevant, even to establish non-economic, actual damages. (Vill. Reply, at 4; *see* Vill. Br., at 13.)

The Fair Housing Act provides that, "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff *actual and punitive damages*." 42 U.S.C. § 3613(c)(1) (emphasis added). A "damages action" brought under this statute "sounds basically in tort." *Curtis v. Loether*, 415 U.S. 189, 195 (1974) (Marshall, J.). As such, actual (or compensatory) damages may consist of not only "out-of-pocket loss and other monetary harms," but also non-monetary harms "determined according to principles derived from the common law of torts." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306-307 (1986) (Powell, J.) (considering compensatory damages, since a Section 1983

claim is also a "species of tort liability") (quotations omitted); *see* Robert G. Schwemm, Compensatory Damages in Federal Fair Housing Cases, 16 Harv. C.R.-C.L. L. Rev. 83, 90 (1981) ("[W]hatever the statutory basis, a housing discrimination claim sounds in tort and . . . compensation principles applicable to tort law generally and to dignitary torts in particular should govern damage awards in fair housing cases."); *cf. U.S. v. Vulcan Soc'y, Inc.*, 897 F. Supp. 2d 30, 35 (E.D.N.Y. 2012) (Garaufis, J.) (holding that "specific categories [of compensatory damages] that have been recognized and defined in the common law of tort" are also available for Title VII, Section 1981, and Section 1983 discrimination claims).

Non-monetary harms, "compensable in the common law of tort," include (i) "emotional distress" and (ii) the "loss of enjoyment of life." *Vulcan Soc'y, Inc.*, 897 F. Supp. 2d at 42-43; *accord U.S. v. Hylton*, 944 F. Supp. 2d 176, 195-97 (D. Conn. 2013) (Hall, J.) (holding, in a Fair Housing Act case, that the plaintiffs were also entitled to compensatory damages for "emotional distress," defined as "severe mental trauma associated with unlawful discrimination," *and* for "fewer life chances," such as a lower "quality of life") (quotations omitted); Schwemm, *supra*, at 90 (stating that "economic loss," "emotional distress," *and* "loss of rights" are all "judicially recognized as an appropriate basis for an award of compensatory damages to a victim of housing discrimination").

Actual damages for "emotional distress" do not require proof that a plaintiff either displayed "physical symptoms" of the distress or "sought medical treatment" for it. *Patrolmen's Benevolent Ass'n of N.Y. v. City of N.Y.*, 310 F.3d 43, 55-56 (2d Cir. 2002) (Section 1983 claims); *see also Hylton*, 944 F. Supp. 2d at 196 (awarding "garden variety" damages for emotional distress, "meaning the claim for distress is devoid of evidence of medical treatment or physical manifestation"). On the other hand:

A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. . . . Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, . . . , or the objective circumstances of the violation itself.

*Patrolmen's Benevolent Ass'n of N.Y.*, 310 F.3d at 55 (citations omitted).

Regarding actual damages for the "loss of enjoyment of life":

The concept of loss of enjoyment of life . . . provides compensation for the deprivation or impairment of the senses or of one's ability to engage in those activities and perform those functions which were part of the victim's life prior to the injury. . . .

Proof of loss of the normal pursuits and pleasures of life . . . does not depend on evidence of the injury or the accompanying physical sensations and emotional response. Rather, a 'before and after' method of proof is used which requires evidence of (1) the nature and extent of plaintiff's lifestyle *prior* to being injured, and (2) the limited lifestyle of the plaintiff afterwards.

*Rufino v. U.S.*, 829 F.2d 354, 359 n.8 (2d Cir. 1987) (emphasis in original; quotations omitted)

(Federal Tort Claims Act claim); *see also Vulcan Soc'y, Inc.*, 897 F. Supp. 2d at 44-45, 47 (citing

*Rufino* with approval, and holding that there is "no compelling reason to distinguish between the

discrimination and personal injury contexts for the purposes of defining loss of enjoyment of

life").

Considering the above principles, the "Community Activity" photographs appear relevant

in establishing non-economic, actual damages, namely, Plaintiffs' emotional distress and their

loss of enjoyment of life. Plaintiffs focus on the fact that these photographs help to prove that

they suffered emotional distress damages from the "loss of this community" among Hispanic

residents in the Village, as a result of the alleged housing discrimination. (Pls. Opp., at 13.) The

Village's response is that the absence of "medical support" and "any other evidence of emotional

distress" renders these photographs irrelevant. (Vill. Reply, at 4.) On the contrary, medical

treatment and physical manifestation evidence are not essential in establishing emotional distress

damages. Plaintiffs' own testimony—paired with these photographs, other substantiating testimony, and additional information about the "objective circumstances" involving the alleged housing discrimination—could be enough to establish their emotional distress damages. *Patrolmen's Benevolent Ass'n of N.Y.*, 310 F.3d at 55.

Even if these photographs are not relevant to the issue of emotional distress damages, they nonetheless are relevant to the issue of damages for the loss of enjoyment of life. Plaintiffs do not raise this issue, but this Court believes that it is a possible basis for finding damages in this case. These photographs may satisfy the first step of the "'before and after' method," applicable to prove damages for the loss of enjoyment of life. *Rufino*, 829 F.2d at 359 n.8 (quotations omitted). By showing that Plaintiffs were once able to interact with a community of other Hispanic residents, these photographs could be important to show that the alleged housing discrimination deprived them of, or impaired, this ability.

Accordingly, this Court denies the Village's motion to exclude the "Community Activity" and "parking restrictions" photographs.

### F.  "Vision Long Island" Records

It appears to be undisputed that the Village hired an organization, Vision Long Island, to recommend ways to redevelop various areas within the Village. (*See* Pls. Opp., at 22; Vill. Reply, at 6.) The Village's central challenge to the admission of the Vision Long Island records relating to the "visioning process," *i.e.*, meeting minutes, reports, and presentations,[17] is that this evidence constitutes hearsay.[18] (Vill. Br., at 22-23; *see* Vill. Reply, at 6-7.)

---

[17]    (See JPTO Pls. Exs. 5, 58, 218, 293, 342-43, 363, and 397.)

[18]    Because this Court concludes *infra* that these records are admissible for a relevant non-hearsay purpose, it need not also address the Village's related arguments that these records are

On examination, these records seem to evidence that, throughout this process, Vision Long Island recommended, among other things, that the Village's redevelopment should preserve affordable housing options, such as the Building, and refrain from displacing residents. (*See, e.g.*, JPTO Pls. Exs. 5 ("Identify strategies to preserve existing affordable and low income housing stock."), 58 ("VISION has long established the position that people should not be displaced. . . . [T]he [Secatogue apartments] shouldn't be torn down until an adequate alternative has been put in place for the residents."), and 342 ("Vision plans to tie the Farmingdale train station area redevelopment in with the Village visioning.").)

Plaintiffs propound two purportedly relevant purposes for which they intend to offer these records at trial. (Pls. Opp., at 22-23.) First, Plaintiffs seek to introduce these records "to show [the] availability of less discriminatory means of improving the conditions of the building." (Pls. Opp., at 22.) Such a showing is relevant to Plaintiffs' claim that the Village's alleged redevelopment plan had a discriminatory impact upon its Hispanic residents. *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 939 (2d Cir. 1988) ("Once a plaintiff has made a prima facie showing of discriminatory effect, a defendant must present bona fide and legitimate justifications for its action with *no less discriminatory alternatives available*.") (emphasis added); *see also Rivera*, 784 F. Supp. 2d at 145 (citing *Huntington* with approval).

However, when offered for this purpose, the Vision Long Island records, standing alone, constitute hearsay. Plaintiffs are seeking to introduce the records not simply to show that recommendations about "less discriminatory alternatives" were made, but that these proposed "alternatives" were *actually* available. In other words, the truth of the recommendations, and not

irrelevant and amount to lay opinion testimony offered for their truth. (Vill. Br., at 22-23; Vill. Reply, at 6-7.)

merely their expression, matters. Thus, unless the viability of the recommendations in the Vision Long Island records is established through other direct evidence, the recommendations are not admissible to show that "less discriminatory alternatives" existed.

The second purpose for which Plaintiffs seek to admit the records is to show that the Village received the recommendations, but "blatantly rejected" Vision Long Island's proposal to include the Building in the visioning process. (Pls. Opp., at 23.) Such a showing is relevant to Plaintiffs' claim that the Village acted out of "discriminatory motives." (*Id.*) As with the "public controversy" surrounding the renovation of the Building (*see supra* discussion at Section I.D.1), what is relevant is that the Village was aware of Vision Long Island's recommendations about "less discriminatory alternatives," but proceeded to apply the alleged redevelopment plan to the Building anyway. *See Vill. of Arlington Heights*, 429 U.S. at 267 (noting that the adoption of a new restriction on the use of the property to single-family homes, *after* the town found out about the "integrated housing" plans, would have been relevant to the "specific sequence of events leading up" to the town's decision to reject the plans). The mere fact that the recommendations were made, *i.e.*, their expression and not their truth, would be enough to reinforce an inference that the Village acted with discriminatory intent.[19] The Vision Long Island records are therefore admissible for the relevant non-hearsay purpose of establishing the Village's awareness of the recommendations contained therein, as part of the "sequence of events" culminating in the Building's renovation. However, if this is the only purpose for which they are admitted, this

---

[19] This Court rejects Plaintiffs' argument that "[s]tatements made by Village officials," as repeated in these records, are "opposing party statement[s]" beyond the definition for hearsay (Pls. Opp., at 25). The argument overlooks the double-hearsay problem, similar to the one addressed *supra* at Section I.D.1. Plaintiffs have not demonstrated how such statements overcome this problem.

Court will consider issuing a limiting instruction to prevent the jury from considering them for any other purpose.

The Village also objects to several other records (JPTO Pls. Exs. 269 and 271-73), which appear to be communications between Vision Long Island and Plaintiffs' counsel concerning the production of documents during discovery, on the basis of hearsay. (Vill. Br., at 22.) These records, as hearsay or non-hearsay, do not seem to be relevant to any purpose for which Plaintiffs purport to offer them. This Court therefore excludes these records, until Plaintiffs can explain why they are relevant.

Accordingly, this Court denies the Village's motion to exclude these records as hearsay, *except* that it grants the motion with respect to the records identified as JPTO Pls. Exs. 269 and 271-73, the relevance of which is unclear. If Plaintiffs offer these records for some purpose other than the relevant non-hearsay purpose of showing that Vision Long Island's recommendations were part of a "sequence of events," this Court may revisit the hearsay issue.

### G. Lay Testimony

#### 1. Spouses & Children

The Village opposes, as irrelevant, testimony by Plaintiffs' spouses and children regarding (i) any "condition" that relates to the alleged housing discrimination and (ii) "damages" that Plaintiffs suffered based on such discrimination. (Vill. Br., at 24-25; *see* Vill. Reply, at 7-8.) According to the Village, only the "personal knowledge" of Plaintiffs, and not their spouses and children, is relevant in proving the above facts. (Vill. Br., at 24-25.)

The non-party status of Plaintiffs' spouses and children, however, does not render their testimony irrelevant. First, these individuals may still be able to provide relevant, firsthand testimony to prove the existence of the conditions upon which Plaintiffs' housing discrimination claims are based. (Pls. Opp., at 26-27); *cf. Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268,

277 (2d Cir. 2009) (Jacobs, C.J.) (holding that the testimony of the plaintiffs' "other family members" was also relevant in creating a triable issue with respect to their disability-based discrimination claim).  For instance, these individuals could testify that they too noticed firsthand the Village's heightened employment of traffic enforcement policies near the Building, or that they saw some of the controversy behind the Building's renovation.  As discussed *supra* at Sections I.B and I.D.1, such testimony regarding these conditions could reinforce an inference of the Village's discriminatory reasons for pursuing its alleged redevelopment plan.

Second, testimony by Plaintiffs' spouses and children, based on their personal knowledge, may provide the "other evidence" necessary to "substantiate[]" Plaintiffs' testimony concerning their own emotional distress damages.  *Patrolmen's Benevolent Assn of N.Y.*, 310 F.3d at 55.  Despite what the Village argues, such testimony would not be used to "speculate on 'damages' suffered by persons not parties to the action," *i.e.*, other members of Plaintiffs' households (Vill. Br., at 24), but rather to show that the alleged housing discrimination "impacted the family and ultimately exacerbated a plaintiff's distress."  (Pls. Opp., at 27.)

The Village also opposes, as hearsay, a spouse's or child's testimony regarding "communications" between Plaintiffs, or other members of their households, and the Village. (Vill. Br., at 25; *see* Vill. Reply, at 8.)  Plaintiffs, however, propose that such testimony "will be offered solely to establish that the communication occurred," as opposed to the accuracy of what was communicated. (Pls. Opp., at 28.)  The Village seems to concede that Plaintiffs "can certainly testify that a communication was made, without offering to prove the truth of the subject matter of such a communication."  (Vill. Reply, at 8.)

Accordingly, this Court denies the Village's motion to exclude the testimony of Plaintiffs' spouses and children as irrelevant or constituting hearsay.

### 2. Other Witnesses

#### i. Janet Liotta & Christina Ruiz-Diaz

The Village opposes the testimony of Janet Liotta and Christina Ruiz-Diaz, described by Plaintiffs as "advocates on behalf of the Village's Latino community" (Pls. Opp., at 29). (Vill. Br., at 26-27.)

The Village contends in conclusory terms that Liotta's and Ruiz-Diaz's testimony is irrelevant and constitutes hearsay and/or improper lay opinion testimony. (*Id.*) Plaintiffs, however, represent that Liotta and Ruiz-Diaz will testify about their respective advocacy roles and observations regarding changes with respect to the area around the Building, "based solely on their personal knowledge and experiences." (Pls. Opp., at 29.) Nothing in Plaintiffs' representations—and notably, the Village provides no real argument to suggest otherwise— indicates that such testimony is irrelevant or amounts to hearsay.[20]

Nor do these representations indicate that such testimony involves the rendering of lay opinions, rather than the simple relaying of personal, factual observations relating to Plaintiffs' housing discrimination claims. *See Bazile v. N.Y.C. Hous. Auth.*, No. 00-CV-7215, 2002 WL 171690, at *11 n.21 (S.D.N.Y. Feb. 1, 2002) (Scheindlin, J.) ("While . . . [no] lay witness may offer her opinion as to whether [the plaintiff] was treated differently on the basis of race, [they] may certainly offer their observations based on personal knowledge.").[21]

---

[20]  Liotta's testimony is also relevant for the purpose of authenticating evidence. *See supra* discussion at Section I.D.2.

[21]  If Liotta or Ruiz-Diaz *were* to offer a lay opinion as to "why [P]laintiff[s] suffered" as a result of actions taken by the Village, *i.e.,* because they were Hispanic, the opinion would only be permitted, if Liotta or Ruiz-Diaz was "involved," and thus was able to observe, the Village's "decision-making processes." *Hester v. BIC Corp.*, 225 F.3d 178, 184 (2d Cir. 2000) (citing Fed. R. Evid. 701). Otherwise, "subjective impressions" that the Village's actions were "attributable to [Plaintiffs'] race" would be improper and inadmissible. *Id.*

Furthermore, the fact that Judge Hurley already considered statements from Liotta and Ruiz-Diaz on summary judgment is a compelling reason to admit such testimony at trial. *See Rivera*, 784 F. Supp. 2d at 148, 150; *see also supra* discussion at Section I.D.1.

Accordingly, this Court denies the Village's motion to exclude Liotta's and Ruiz-Diaz's testimony to the extent it is based on personal knowledge.

### ii. Eric Alexander

The Village opposes the testimony of Eric Alexander, Vision Long Island's executive director, as irrelevant, because "there was no enactment or general acceptance of" the recommendations by Vision Long Island. (Vill. Br., at 27.)

On the contrary, the Village's very failure to accept these recommendations *is* a relevant fact. As with the Vision Long Island records, Alexander's testimony possibly serves two purposes: showing that (i) Vision Long Island developed, during the visioning process, "less discriminatory alternatives" to renovating, and requiring Latino residents to leave, the Building; and (ii) the Village was aware of, but rejected, these alternatives in permitting the renovation to proceed according to its alleged redevelopment plan. (*See* Pls. Opp., at 24 (stating that Alexander will testify about "how the Village specifically instructed him to exclude [the Building] from the visioning," despite Vision Long Island's "strong stance that the building should not have been torn down until adequate alternatives were put in place").) Either purpose is relevant to proving important aspects of Plaintiffs' housing discrimination claims, *i.e.*, discriminatory impact and intent. *See supra* discussion at Section I.F.

Accordingly, this Court denies the Village's motion to exclude Alexander's testimony.

### iii. Joanne Krapp

The Village opposes Joanne Krapp's impeachment testimony as irrelevant and amounting to hearsay. (Vill. Br., at 27.) The testimony is intended to impeach Graf at trial,

should he deny making a prior statement about "allocating $45,000" to assist the Building's residents in relocating as a result of the renovation. (Pls. Opp., at 30; *see* Vill. Reply, at 9.)

Krapp's impeachment testimony—that Graf actually made the prior statement—would not amount to hearsay. The purpose of extrinsic evidence concerning Graf's "prior inconsistent statement[]," including such testimony, would not be to demonstrate the "truth" of the prior statement, "but rather to demonstrate [his] lack of credibility" as a witness. *U.S. v. Mergen*, No. 12-CR-2873, 2013 WL 5857143, at *2 (2d Cir. Nov. 1, 2013); *see also U.S. v. Ploof*, 311 F.2d 544, 546 (2d Cir. 1963) (holding that the jury was appropriately instructed that the testimony of two agents that "[the prosecution witness] made to them a statement contrary to his testimony" was admissible to "impeach," and not to challenge the "issue of [defendant's] guilt"). In short, such testimony possibly serves a non-hearsay purpose of showing that Graf did not testify honestly, in that he denied the prior statement despite having made it.

Such testimony is also relevant to impeaching Graf's credibility regarding an issue that is not merely collateral, "*i.e.*, as to those matters which are relevant to the issues in the case and could be independently proven." *U.S. v. Blackwood*, 456 F.2d 526, 531 (2d Cir. 1972) ("A witness may be impeached by extrinsic proof of a prior inconsistent statement only as to matters which are not collateral[.]"). In this case, the non-collateral issue is "the Village's direct involvement" in the renovation of the Building. (Pls. Opp., at 30.) The Village disputes the relevance of such testimony to this issue, by arguing that the Building's residents were "reimbursed for their displacement . . . by Fairfield" and not by the Village. (Vill. Br., at 27; *see* Vill. Reply, at 9.) The argument ignores the fact that, even if the Village did not use the money that it supposedly allocated to fund the relocation of the Building's residents, the Village's allocation of the money may still evidence its involvement in the renovation. Should Graf deny

the prior statement, and thereby diminish proof of the Village's involvement, Plaintiffs should be permitted to introduce such testimony to impeach the credibility of Graf's denial.

Accordingly, this Court denies the Village's motion to exclude Krapp's impeachment testimony.

### iv. Jean Paul Rodrigue

The Village opposes Jean Paul Rodrigue's authentication testimony, as such testimony only serves to authenticate a "demonstrative aid" (JPTO Pls. Ex. 96) that is irrelevant. (Vill. Reply, at 8-9.) The "demonstrative aid" appears to evidence the Village's employment of traffic enforcement policies, premised on the parking tickets that it issued in various areas. (JPTO Pls. Ex. 96.) The Village's relevance objection to such testimony stems from its same objection to the category of evidence regarding traffic enforcement policies, and is thus rejected. *See supra* discussion at Section I.B.

Additionally, the Village opposes such testimony, arguing that it requires Rodrigue to opine as an expert. (Vill. Br., at 28.) Rodrigue, however, need not provide expert testimony to authenticate the "demonstrative aid," which he prepared through a process of "transferr[ing] voluminous quantities of Village data." (Pls. Opp., at 29); *see, e.g.*, *U.S. v. Espinal-Almeida*, 699 F.3d 588, 608, 610-13 (1st Cir. 2012) (holding that the "lay testimony" of an individual—who prepared, with software, the analysis of GPS data "admitted into evidence"—was "sufficient to authenticate the GPS data and software generated evidence"). The data, and the process by which Rodrigue transferred that data, were "not so scientifically or technologically grounded" that expert testimony is necessary. *Espinal-Almeida*, 699 F.3d at 612. Rather, Rodrigue may authenticate the "demonstrative aid" by merely articulating facts, and not opinions, to satisfy a "reasonable likelihood" that the data and the process were accurate and reliable. *Id.* at 612-13.

Accordingly, this Court denies the Village's motion to exclude Rodrigue's authentication testimony. The admissibility of such testimony, however, does not imply that it will suffice to authenticate the "demonstrative aid" identified as JPTO Pls. Ex. 96.

> v. Kerry Galvin, Yesenia Rodriguez, Kathryn Stein & an Unnamed "Nixon Peabody Paralegal"

Finally, the Village opposes the impeachment testimony of former interns for Hofstra Law's Community Legal Assistance Corporation ("Hofstra Law Clinic"), Kerry Galvin and Yesenia Rodriguez, and former Hofstra Law Clinic lawyer, Kathryn Stein; and the authentication testimony of an unnamed paralegal for the law firm of Nixon Peabody LLP. (Vill. Br., at 28-29; *see* Pls. Opp., at 31.) As the Village argues, the above witnesses are "all improper," in that they were, or are, affiliated with Plaintiffs' counsel in this case, Hofstra Law Clinic and Nixon Peabody LLP. (Vill. Reply, at 9-10.)

As the Second Circuit has recognized:

> The advocate-witness rule applies, first and foremost, where the attorney representing the client before a jury seeks to serve as a fact witness *in that very proceeding*. . . . [W]hen one individual assumes the role of both advocate and witness it [may] so blur[] the line between argument and evidence that the jury's ability to find facts is undermined. . . .
>
> For the most part, these concerns are absent or, at least, greatly reduced, where [as here] the lawyer-witness does not act as trial counsel. . . . The only concern that may remain is the implication that [he] may have been biased in his testimony as a result of his former representation of plaintiffs. If the fear of bias were sufficient on its own to prevent [him] from testifying, then a similar argument could be made that an accountant, doctor, or anyone else who ever had a relationship with a party should be forbidden to testify out of a concern for potential bias. That, of course, is not the rule.

*Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 282-83 (2d Cir. 2004) (emphasis in original; second, third, and fourth modifications in original; quotations

and citations omitted) (affirming Judge Edward R. Korman's decision to allow a lawyer to testify at trial).[22]

In this case, the impeachment testimony of the former Hofstra Law Clinic members is not improper, as they are not "trial counsel." *Id.* at 283. Galvin, Rodriguez, and Stein are no longer affiliated with the law clinic. *See Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-488, 2011 WL 3251500, at *12-13 (S.D.N.Y. July 25, 2011) (Pittman, Mag. J.) (applying the advocate-witness rule to "attorneys who are *current members* of the firm presently representing defendants," as distinguished from attorneys who "moved to another firm") (emphasis added). Even if these individuals may still be treated as "member[s] of the trial team" from the law clinic, for purposes of their testimony, there is no possible way for them to "act as [] advocate[s] before the jury." *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 179 (2d Cir. 2009) (Jacobs, C.J.) (citing *Ramey* with approval). Finally, these individuals are only testifying to impeach other witnesses, and not "as [] fact witness[es]." *Ramey*, 378 F.3d at 282. Because these individuals are neither "trial counsel" nor "fact witness[es]," they raise none of the issues regarding "advocate-witness[es]" that warrants barring their impeachment testimony. *Id.* at 282-83.

The same can be said about the unnamed paralegal for Nixon Peabody LLP, whose testimony will purportedly serve to authenticate the same "demonstrative aid" as Rodrigue's testimony (Pls. Opp., at 31). Unlike the former Hofstra Law Clinic members, the paralegal is a current "member of the trial team" from the law firm. *Murray*, 583 F.3d at 179. But, the mere fact that the paralegal "performs behind-the-scenes work for the client[s] in the same case"

---

[22]    Because the "advocate-witness rule" does not apply in this case, this Court need not address the unsettled question of whether a violation of the rule may appropriately be resolved by a motion to exclude the lawyer's testimony. *See Ramey*, 378 F.3d at 283 (noting that "the remedy where an attorney is called to testify may be to disqualify the attorney in his *representational* capacity, not necessarily his *testimonial* capacity") (emphasis in original).

hardly suffices to make him or her "trial counsel." *Culebras Enters. Corp. v. Rivera-Rios*, 846 F.2d 94, 100 (1st Cir. 1988) (Campbell, C.J.). Moreover, the paralegal is merely providing authentication, and not fact, testimony. *Ramey*, 378 F.3d at 282. As such, the paralegal should not be precluded from testifying based on the "advocate-witness rule." *Id.*

The paralegal, however, should be precluded from testifying, because he or she is unnamed. Plaintiffs, in the joint pre-trial order, have solely identified the paralegal as a "Representative of Paralegal Department, Nixon Peabody." (Dkt. No. 190, at 15-16); *see, e.g.*, *Marceline v. Delgado*, No. 09-CV-1591, 2012 WL 517301, at *5 (D. Conn. Feb. 16, 2012) (precluding the testimony of a witness "listed in the Joint Trial Memorandum as an unnamed 'civilian witness'"); *Loussier v. Universal Music Grp., Inc.*, No. 02-CV-2447, 2005 WL 5644439, at *7 (S.D.N.Y. Aug. 24, 2005) ("[T]he Court excludes testimony from the unidentified representatives of [two non-party corporations][.]"). The fact that the paralegal is only offering authentication testimony is no excuse for Plaintiffs' failure to name him or her. *See* Fed. R. Civ. P. 26(a)(1)(A)(i) (requiring a party to disclose "the name . . . of each individual likely to have discoverable information . . . , *unless the use would be solely for impeachment*") (emphasis added). Surely at this late stage in the litigation, Plaintiffs should be able to identify the paralegal who will authenticate the "demonstrative aid."

Accordingly, this Court denies the Village's motion to exclude the impeachment testimony of Galvin, Rodriguez, and Stein, but grants the motion with respect to the unnamed paralegal for Nixon Peabody LLP, subject to Plaintiffs identifying the paralegal at least one week before trial.

This Court reserves decision on the Village's challenge to the impeachment testimony of the former Hofstra Law Clinic members on relevance grounds (Vill. Br., at 28-29). Without

more specifics about each individual's testimony, a relevance determination is premature.  *See U.S. v. Forest*, 729 F. Supp. 2d 403, 411 (D. Me. 2010) (Woodcock, Jr., C.J.) ("It is too early to make a definitive determination.  Trials take on a life of their own and based on this record, it is premature to rule in or rule out [a witness's] impeachment testimony.").

II.    Conclusion

This Court GRANTS in part and DENIES in part the Village's omnibus motion to exclude various evidence.  The only evidence to be excluded are:  (i) four newspaper articles identified as JPTO Pls. Exs. 179, 208-209, and 447;  (ii) four of the Vision Long Island records identified as JPTO Pls. Exs. 269 and 271-73; and (iii) the testimony of the unnamed paralegal for Nixon Peabody LLP.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: December 31, 2013
       Brooklyn, New York